556 So.2d 215 (1990)
Eva Wise WAITS, Plaintiff/Appellant,
v.
Lonnie Joe WAITS, Defendant/Appellee.
No. 21124-CA.
Court of Appeal of Louisiana, Second Circuit.
January 24, 1990.
Joe D. Guerriero, Monroe, for plaintiff/appellant.
Lesa H. McGaha, Ruston, for defendant/appellee.
Before SEXTON, NORRIS and LINDSAY, JJ.
*216 NORRIS, Judge.
The mother, Eva Wise Waits Gurgiolo, appeals a judgment on a rule to modify the joint custody of two children, Joshua (age 5) and Joseph (age 2). A prior judgment had allotted an even six months of domiciliary custody to her and the father, Lonnie Joe Waits, with the proviso that the children would always remain at the former matrimonial home in Arcadia and the parents would spend alternating six-month periods with them. The parties, however, have hardly complied with this plan; they were bitterly antagonistic and uncooperative, and often resorted to legal means to enforce visitations and custody exchanges. Both sides filed change of custody rules which were consolidated and heard in January 1989. After listening to extensive evidence, including expert testimony, the trial court amended the joint custody order to make the father primary custodian for nine months (the school year) and the mother for three (summer vacation), with familiar visitation and vacation provisions.
The mother now appeals, urging the trial court erred in finding the children's best interest would be served by awarding primary custody to a father who consistently refused to let her exercise visitation, fought with her, disregarded court orders and abused legal process. She also claims the trial court erred in not finding the father's home environment was detrimental to the children. For the reasons expressed, we affirm.

FACTS
Eva and Lonnie were married in 1983. It was the second marriage for both of them and each had a child from the previous marriage. During the instant marriage, Joshua and Joseph were born. Eva sued for separation in June 1986, alleging cruel treatment. She received provisional custody of the children; Joseph was at the time four months old.
The first trial of custody and support was held in June 1987. From the bench Judge Butler ruled that the children were to stay in the house in Arcadia and the parents were to take turns living with them for six-month intervals. According to the order, Lonnie was to be at the house until the end of June; at the beginning of July Eva was to move in and stay through December. The judgment, however, was not signed and filed until September 14.
On July 1 Eva, accompanied by her mother and father, came to the house at 12:01 a.m., ready to move in. Lonnie turned her away. When Eva returned at midmorning there was a violent confrontation. The children were not at the house; Eva went through the rooms, searching vainly, and Lonnie refused to tell where they were. When Eva accused Lonnie of removing some of her personal belongings from the house, the argument escalated. Lonnie called the sheriff's office but no one came. Finally Lonnie and Eva exchanged insults about each other's parents. Lonnie flew into a rage and bounded after her. Eva claims he hit her in the face, but Lonnie claims she bumped into a wall while trying to flee. Lonnie admits he physically threw her out the back door and onto the pavement. Eva's mother, who had waited outside, helped her up and they declined Lonnie's offer to call an ambulance. (They also declined help from Lonnie's uncle, who had happened upon the scene.) Instead they went to the sheriff's office to show someone what Lonnie had done. When it appeared that no one would help them, they went to the courtroom area and flagged down Judge Butler, who sent her to the hospital. Judge Butler's deposition was offered at the subsequent trial. When he saw Eva that morning, she appeared to have "been in an accident or something of that nature" and was "bloody all over the face." Butler's Dep., 4, 6.
Lonnie claimed he had several good reasons for refusing to give up the house and children on that occasion. He "understood" Eva would give him a few extra days to move out; Eva denied any such understanding. He also said Eva came at an inconvenient time, right after midnight; Eva thought, however, that when Lonnie had told her July 1 started at 12:01 "as far as he is concerned," he meant she could come then. Lonnie also claimed to believe *217 that Judge Butler's order was not valid because it was not yet signed. Nevertheless he felt sure Eva intended not to comply with the unsigned order, since she showed up in an empty truck as though just to pick up the boys but not move into the house. Eva contends the truck was loaded with her clothes, some food and small household items and she fully intended to occupy the house.
Most of the later incidents of custody exchanges and visitation were thwarted, or at least riddled, by the same kind of misunderstanding, recrimination and petty excuses outlined above. To reiterate all the accusations for each incident would serve no useful purpose here; for brevity's sake we will merely outline the subsequent events. Fortunately there was no further physical violence.
After she left the hospital on July 1, Eva's attorney filed an ex parte motion for return of the children. In fact, Eva returned to Judge Butler's chambers shortly after lunch that day; by then she was "an entirely different person" with a clean, unbruised face, and she was "almost running when she came in." Butler's Dep., 8, 9. Judge Butler signed an order dated July 3 and Eva got custody of the boys for a few days. Lonnie responded on July 10 with his own "motion and order for custody" which Judge Butler signed, granting Lonnie "temporary" custody pending hearing on the rule. The rule was set for July 30 but it was upset and continued without date. As a result, Lonnie kept the boys for over a year. Meanwhile Eva moved to Monroe and lived at four different addresses over a year's time. She hired a new lawyer and began what was by her description a barrage of requests for visitation, chiefly by phone calls from her attorney to Lonnie's attorney. She was unsuccessful, and ascribed it to Lonnie's refusal to cooperate. According to Lonnie, she made no effort or no genuine effort to see the boys during this time because she was too busy courting her new husband. In September 1987 Eva filed for divorce and custody in Ouachita Parish. The divorce was granted but custody dismissed for improper venue. During this time Eva met her new husband, Danny Gurgiolo, and they married in May 1988. Eva hired her third attorney, Joe D. Guerriero, and between late May and late June, she exercised weekend visitation three times.
On July 1, 1988 Eva (with Danny) returned to the house in Arcadia to move in, in accord with the June 1987 judgment, which had been signed on September 14, 1987. Lonnie refused to let them in. Eva and Danny tried again about a month later but were again refused entry. Lonnie filed a new rule for change of custody, which Judge Butler signed on August 4, including another order granting Lonnie "temporary" custody pending a hearing. Eva responded with another ex parte motion to enforce the June 1987 judgment, together with another rule for custody requesting domiciliary custody for 11 months of the year. Judge Butler signed this order on August 11, rescinding his order of August 4 and instructing Lonnie to give the boys to Eva by August 16. Lonnie complied, and Eva kept the children until December 31. During this time, visitation worked smoothly, which had not been the case while Lonnie had custody. Eva also filed a motion to recuse Judge Butler, which was granted. The opposing rules were consolidated and tried on January 12 and 13, 1989.
At this second trial of custody, Eva and Lonnie testified to the facts as outlined above. Additionally, each accused the other of scheming to deny lawful custody and of planting a dislike of the other in the boys' minds.
There was also expert testimony. When she got the boys for visitation in late May 1988, Eva found they were having nightmares so she brought them to a psychiatric social worker, Mrs. Meriwether. To her the boys related some untoward events at Lonnie's house, mostly involving Lonnie's 16-year-old daughter from the prior marriage. This girl appears to have been a discipline problem for her mother, which is why she was staying with Lonnie; by the time of trial, however, she had left Lonnie's house and moved in with her grandmother (Lonnie's mother), Mrs. Waits. The most serious charge against the daughter, that *218 she made the boys drink their urine, was allegedly cleared by a DHHR investigation. Mrs. Meriwether observed a number of minor psychological problems in May, but felt these were clearing up by December, after the boys had been with Eva for several months. Mrs. Meriwether felt the best results would obtain if the parents stopped using the children as weapons against each other. She said the best environment would be with the parent who fosters an ongoing relationship with the other parent, as Eva has done, and that 90% of children bond more closely to the mother. Mrs. Meriwether did not identify any major problems with these children. Lonnie had the children examined by Dr. Stephenson, a child psychologist. He also noted some fears and apprehensions in the boys, but these were clearing up by January 1989. He saw no reason why Lonnie would not be a good parent, and felt both parents needed contact with the boys.
Lonnie showed that if he received custody he would be able to stay with the boys until about 3:00 p.m. each day, when he reported to work as a Louisiana Tech police officer. His mother, Mrs. Waits, got off work about that time and was perfectly willing to come straight to Lonnie's house and watch them until their bedtime or whenever Lonnie got home. Lonnie's daughter would play no part in the childcare.
Eva showed that she and Danny now have a comfortable home in Monroe and can provide the boys with their own room and various activities. Eva has been either working or attending Cloyd's Beauty School, so she has had to place the boys in daycare at Little Rascals; but Joshua loved it there, and Mrs. Meriwether had highly recommended that particular daycare center. Eva has also taken leaves of absence from beauty college during the summer or around major holidays when she had custody or extended visitation.
The trial court, through Judge Newell's written reasons for judgment, found the parties were bitterly antagonistic and that the original six-month plan was "untenable" as the children approached school age. The court was impressed by Dr. Stephenson's testimony but rejected Mrs. Meriwether's as too "predisposed to the conclusions she reached." The court found Lonnie would provide a more stable environment, as the boys had grown up with him and were close to his family. As noted, the court awarded joint custody, making Lonnie the primary custodial parent for the nine months of the school year and Eva for the rest, with visitation on alternate weekends and holidays, and arrangements for vacation.

DISCUSSION
Permanent custody is determined with the aid of the same statutory considerations as apply to provisional custody. LSA-C.C. arts. 157, 146. Art. 146 creates a rebuttable presumption that joint custody is in the best interest of the child. Turner v. Turner, 455 So.2d 1374 (La. 1984). The burden of proving that sole custody would be in the child's best interest rests upon the parent seeking sole custody. Art. 146A(2). The trial court's decision in child custody matters is entitled to great weight and it will not be overturned absent a showing of manifest error or abuse of discretion. Bergeron v. Bergeron, 492 So.2d 1193 (La. 1986); Estes v. Estes, 261 La. 20, 258 So.2d 857 (1972); Pacheco v. Pacheco, 486 So.2d 1098 (La.App. 2d Cir.1986).
In cases where there has been a prior, considered decree of custody and one parent wants to modify it, he must prove either that the present custody plan is so deleterious to the children as to justify a modification, or he must prove by clear and convincing evidence that the harm likely to result from the change of environment is substantially outweighed by the benefits. Bergeron v. Bergeron, supra, and citations therein. If the court determines that a change is justified, it may enter the appropriate modification, with a statement of reasons. Art. 146 E. In any decree of joint custody, original or modified, the law does not require an even 50/50 sharing. It only requires substantial sharing. Key v. Willard, 488 So.2d 1147 (La.App. 2d Cir. 1986); Carroway v. Carroway, 475 So.2d *219 48 (La.App. 2d Cir. 1985). The overriding principle is the best interest of the children. Everett v. Everett, 433 So.2d 705 (La. 1983).
In brief, though not specifically by assignment of error, appellant prays that she should receive sole custody of the boys. Br., 18. The district court specifically found that both parents love the boys, provide for them, offer an adequate home environment and spend adequate time with them. By awarding joint custody, the court found neither parent had rebutted the statutory presumption and proved a right to sole custody. The court's findings and conclusion are not plainly wrong. Sole custody was properly denied.
The more serious argument is whether the evidence was sufficient to justify modifying the existing six-month custody plan to one that gave the father nine months of the year. Neither the parties in brief nor the district court in reasons for judgment addressed the requirement of showing changed circumstances serious enough to meet the criteria of Bergeron, supra.
The evidence clearly showed that the original custody decree, calling for six-month sharing in the same house in Arcadia, was completely unworkable. The very impossibility of this plan was almost certainly a factor in the difficulties encountered. It is unreasonable to expect the parties to move twice a year, especially now that Eva has remarried and established a home in Monroe with her husband and other son. It is burdensome to secure alternate lodgings for six months of noncustodial time. Lonnie frankly resented having to give up the house while he was still paying the house notes, though this point would be better resolved by a community settlement. All of this aggravated an already difficult situation and made the parties even more resentful and antagonistic. The parties agreed the plan was a failure. The result was a situation not in the children's best interest. We feel that when an original, considered decree is shown to have failed so abjectly, this fact may contribute to a finding of changed circumstances that result in detriment to the children.
The court also found that the boys were approaching school age; their best interest would be served by keeping them in one place for the duration of the school year. The court obviously considered that the "same house" aspect of the prior decree had not been observed and would have to be discarded. Since the mother has moved to Monroe, retention of a 50/50 sharing plan would necessarily involve splitting the school year. This situation is almost invariably against the children's best interest. See Eiswirth v. Eiswirth, 500 So.2d 817 (La.App. 1st Cir.1987), writ denied 502 So.2d 111 (La. 1987). Admittedly the original plan, insofar as it decreed a 50/50 split, was not as burdensome as the plan in Eiswirth, but the general principle is that stable school attendance should not be sacrificed for an objective of 50/50 sharing. The time allotment of the original plan was simply contrary to the boys' educational best interest.
Moreover, the jurisprudence admits that when parents are violently antagonistic, joint custody may be inappropriate. See Slaughter v. Slaughter, 466 So.2d 1370 (La.App. 3d Cir.1985); Long v. Long, 458 So.2d 662 (La.App. 3d Cir.1984); Serrate v. Serrate, 472 So.2d 137 (La.App. 5th Cir. 1985). The rationale is that joint custody in those cases creates a volatile atmosphere that is not good for the children. If the parents' inability to get along can justify denial of joint custody, a fortiori it may justify amending a joint custody decree to place the children with one parent longer than the other.
We therefore conclude that the evidence adduced at trial was sufficient to prove that the existing plan was so deleterious to the children as to justify the modification. Bergeron v. Bergeron, supra.
The main thrust of appellant's argument on appeal is that even conceding that a change was justified, the evidence overwhelmingly preponderated to show that she was the parent who was entitled to receive the longer domiciliary custody. Each of her three assignments of error focuses on one area in which she allegedly proved the *220 superiority of her home environment to Lonnie's, and other relevant facts.
The first assignment urges that Lonnie's past history shows a determined effort to deny the children contact with their mother. Indeed, the importance of continued contact between the child and the noncustodial parent is reiterated throughout art. 146. See Subsec. A(2); C(2)(j); D. The bare fact is that between July 1987 and May 1988 the boys were with Lonnie and had not one single visitation with Eva. Counsel for the appellee conceded at oral argument that visitation went more smoothly while the appellant had custody.
Beyond these facts, however, the evidence is hopelessly conflicting. As noted, Eva claimed to have made numerous efforts to set up visitation through their attorneys, but Lonnie denied this; he asserts that except for July 1987, he and the children were at the former family home in Arcadia and she could have contacted him directly. He felt she was too preoccupied with Danny Gurgiolo to be bothered with the children. Each side cites instances when times and places were set but not honored by the other; the other vehemently denies these instances. On one occasion, Lonnie said he would turn over the boys if Eva would give him an address and phone number where they could be reached; Eva refused to comply; Lonnie refused to let the boys out of the house; and on the argument went. To resolve these conflicts the trial court resorted to a credibility call. Neither of the witnesses was exemplary. Eva changed her story about whether, after the July 1, 1987 incident, she went to the hospital or the sheriff's office first, R.p.p. 116, 141; her description of the beating she sustained was inconsistent with Judge Butler's observations; it was also inconsistent with her mother's account of her lying unconscious on the concrete for 45 minutes. R.p. 508. Under the circumstances, we cannot disturb the district court's apparent conclusion that Lonnie's version of events was more reasonable, and Eva's less. See Rosell v. ESCO, 549 So.2d 840 (La. 1989).
By her third assignment, appellant urges the trial court failed to consider the unsuitable environment the father provided while the boys were in his custody. She reiterates the alleged incidents of mistreatment at the hands of Lonnie's teen-age daughter; Lonnie's bad influence on them by smoking and drinking in their presence, letting them stay up late, using bad language around them, and leaving in plain view firearms with which he and the boys sometimes took pot-shots at neighborhood cats and dogs.
We are constrained to find that this issue again comes to a credibility call. Most of the alleged incidents were adduced only by the testimony of Eva, her mother or her friend, Mrs. Spatafora, who said the boys reported them. Lonnie denied them. He also explained that as a trained police officer he would not leave real guns within his children's reach. R.p. 364. While the boys did report "shooting cats and dogs" to Dr. Stephenson, he interpreted this as involving play guns, and the trial court found him persuasive. Both sides admitted that a DHHR investigation uncovered no evidence that Lonnie's daughter made the boys drink their urine. In sum, the trial court could have found that the appellant's claims were somewhat exaggerated, and that the father's explanations were reasonable. We can detect no basis for disturbing this finding. Rosell v. ESCO, supra.
By her second assignment appellant urges the trial court erred in failing to consider the father's refusal to honor valid court orders, as well as his resort to illegal ex parte orders to give an official aura to his acts. We always deplore disregard for court orders and abuse of legal process. However, Lonnie always offered some explanation which the trial court apparently felt mitigated his conduct. Moreover, the proper remedy for these infractions is contempt, which Eva did not pursue against Lonnie. A timely rule for contempt would have brought Lonnie's actions to the district court's attention sooner and perhaps averted the tribulations that followed.
Furthermore, the purpose of child custody is not to punish an offending parent or *221 reward a good one. Rather it is to provide a custodial plan that serves the child's best interest. Everett v. Everett, supra; Cassidy v. Cassidy, 514 So.2d 1198 (La.App. 1st Cir.1987), writ denied 517 So.2d 814 (La. 1988). The issue of punishment is not appropriate here. The district court obviously felt that despite his problems obeying custody orders, Lonnie's conduct did not provide a bad moral example for the children. And finally, regardless of the excuses and arguments, the trial court correctly noted that Lonnie had exercised custody for a more protracted period of time. Continuation of this prior custody, even de facto custody, serves the codal objectives of "maintaining continuity" in the more permanent of the proposed custodial homes. Art. 146 C(2)(d) and (e). In sum, we detect no manifest error.
We are naturally sensitive to the mother's situation; from the cold record, we would be inclined to agree that the father was the more disrespectful of legal orders, uncooperative and blameworthy in the failure of the prior custody plan. It is peculiar for one parent to reap the benefits of "maintaining continuity" when the foundation was laid by retention of the children on questionable pretexts. We find, however, that there is enough evidence to uphold the district court's finding that primary custody with the father was in the children's best interest. After all, he heard and watched two days of testimony and was unquestionably in a better posture to fashion an order. We will not vacate his reasonable findings even if we feel our own are more reasonable. Rosell v. ESCO, supra; Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The findings, and the plan imposed, are simply not an abuse of discretion.
For these reasons the judgment is affirmed at appellant's costs.
AFFIRMED.