628 So.2d 1221 (1993)
Randi ARD; State of Louisiana, Department of Social Service, Office of Support Enforcement, Plaintiffs-Appellees,
v.
Gordon L. ARD, Defendant-Appellant.
No. 93-470.
Court of Appeal of Louisiana, Third Circuit.
December 8, 1993.
*1222 Randi Ard, pro se.
Jo B. Chandler, Lafayette, for Gordon L. Ard.
Dennis Ray Bundick, Abbeville, for the State, Dept. of Social Service.
Before DOUCET, YELVERTON and WOODARD, JJ.
YELVERTON, Judge.
When a trial judge has made a considered decree of permanent custody, the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. Bergeron v. Bergeron, 492 So.2d 1193, 1200 (La. 1986).
The trial judge in the present case changed the custody of Zachary, age 9, and Alec, age 8, from the father, Gordon Ard, to the mother, Randi Ard. This was done by judgment dated November 3, 1992. Gordon had had custody following a considered decree in April 1990, with Randi having visitation rights. The modified decree, which is the judgment on appeal, substantially switched the situation around, with Randi having sole custody and Gordon having visitation.
Gordon's appeal contends that Randi did not meet her heavy burden of proof. Specifically, Gordon complains that Randi did not prove a change of circumstances nor did she prove that the harm to be caused by a change of environment would be substantially outweighed by advantages to the children. Gordon contends that the reasons given by the trial judge herein are not sufficient to change custody, and that the trial judge herself recognized the heavy burden standard was not met when she said in oral reasons for judgment, "I could just as easily leave them with Mr. Ard as putting them with Mrs. Ard".
The hearing lasted two days and a number of witnesses were called. At the request of the attorneys, the judge talked to the children in chambers before the hearing began. This interview, along with the other testimony, including expert testimony, is in the record. At the conclusion of the hearing, the trial judge gave oral reasons for judgment covering some 40 pages of the record. We affirm the judgment of the trial court.
The changes in circumstances were several. At the time of the original custody order of 1990, Randi was having a number of personal problems. She and Gordon were married in 1977 and divorced in 1980. The children *1223 were not born while they were married. The children were born after they resumed living together, unmarried, following the 1980 divorce. In 1988 Randi had some shoplifting problems. By 1990 she had a severe drinking problem and weighed in excess of 300 pounds. These were the circumstances in 1990 when that custody decree was handed down.
At the hearing in 1992 Judge Simon was convinced that Randi was rehabilitated, telling the truth, and rid of her personal problems. Randi testified that she had not had a drink in over two years and that her other personal problems were straightened out. As objective evidence of her determination to change, Randi's weight was down to 132 pounds. As stated, the trial judge was convinced that Randi was in fact rehabilitated.
The trial judge was also convinced that the children were very troubled, Zack extremely so. This was reflected not only by the testimony of witnesses, but also by the testimony of an expert. It disturbed the trial judge and other witnesses that Zack expressed the wish to be dead and had mentioned suicide.
What bothered the trial judge a lot about the boys was that although they lived with Gordon, he was unaware that the children had any problems. For example, Gordon's reaction to their bedwetting was to make them hold the wet sheet to their nose and sniff it. Other types of punishment for their unruly conduct inflicted by Gordon on the boys included making them lie face down on the floor with their noses in the corner. Additionally, he made them stand on their toes and if they lost their balance, he whipped them. Gordon admitted that he inflicted these punishments.
There was other evidence that the children were unhappy with their father. They were fearful of him. Their relationship with him was a mounting part of their psychological problems. The trial court believed that Gordon's punishment methods reflected an insensitivity and lack of awareness of the deepening problems that the children were experiencing.
Another deleterious condition which the trial court believed needed remedying by a change of custody was what the court termed an extremely severe "parent bashing". The trial judge ascribed this parent bashing principally to Gordon because he had had the children most of the time. The trial judge found that he had used his custodial advantage to bash the mother to undermine a loving relationship that the children had toward her. The court said:
What is the consequence of this? According to what the Court perceives from talking to the children and from listening to all the testimony, this has caused horrible problems with the children. The children made a telling statement to me; they described their mother as a nice lady. Almost in a defensive type of a way.
The trial judge also discussed Gordon's unreasonable refusal to allow the mother's name to be on the school list of who could pick up the children (Gordon's job required periodic offshore stays) from school. The trial judge found that the exercise of Randi's visitation has created some very bad problems. At least three times the police were called to intervene. Gordon's insistence on following the black letter of the visitation order led him to deny Randi the privilege of taking care of the children on their birthday or when they were sick. He preferred that they stay with a baby-sitter while he was out of town.
What the trial court was particularly disturbed about was that the children had been with Gordon since 1990 and "we have a mess on our hands", and Gordon did not even seem to realize that anything deleterious to the children was happening. Although the trial judge blamed Randi in part for "the mess", she felt that the children had a better chance with Randi, and that placing them with Randi was the only present alternative to the harsh resort of foster care. In her reasons for judgment she remonstrated at length with the parents, telling them that it was their immaturity, their selfishness, and their persistence in holding grudges and throwing *1224 rocks at each other every chance they could get, that was part of the blame. She explained that despite their parental imperfections, the children loved them both, and it was in this context that she said she could as easily leave them with one as the other, if the love the children had toward their parents would control the choice.
The boys expressed a desire in this case to live with Randi. The trial judge found that the situation was not ready for joint custody. La.Civ.Code art. 131(C)(2)(j) lists as a factor to be considered when rebutting joint custody the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and other parent. The trial judge found that Gordon had abused his power as custodial parent and that not only had he failed to foster a close and continuing relationship with the mother, but also he had systematically and continually interfered with any possibility of the children having a close and continuing relationship with their mother.
The trial judge found that joint custody was not possible because the parents were not communicating with one another or able to get along. In Slaughter v. Slaughter, 466 So.2d 1370 (La.App. 3d Cir.1985) joint custody was not a viable alternative where a mother and father could not communicate at all unless it was absolutely necessary. In the present case the parents have not communicated at all with each other. When they were together around the children and other people, the climate was hostile. Some school officials would not let Gordon on the premises. The trial judge ordered that both the parents and the children get counseling so that they could work towards a joint custody arrangement for the sake of the children at some time in the future.
We conclude that the trial judge did not abuse her discretion in finding that sole custody with Gordon was so detrimental to the boys' well being as to justify a change of custody to Randi. We also agree that joint custody at this time is not in the best interests of the children.
For the reasons assigned, the judgment of the trial court is affirmed at the costs of Gordon Ard.
AFFIRMED.