676 So.2d 619 (1996)
William Scott HAWTHORNE, Plaintiff-Appellee,
v.
Virginia L. Whitfield HAWTHORNE, Defendant-Appellant.
No. 96-89.
Court of Appeal of Louisiana, Third Circuit.
May 22, 1996.
*620 Kenneth D. McCoy Jr., Nachitoches, Nancy Sue Gregorie, Baton Rouge, for William Scott Hawthorne.
Geary Stephen Aycock, West Monroe, Robert Stephen Tew, Monroe, for Virginia L. Whitfield Hawthorne.
Before SAUNDERS, AMY and GREMILLION, JJ.
AMY, Judge.
This is a child custody case. Defendant appeals from the trial court's judgment granting plaintiff domiciliary custody of their son and granting defendant limited visitation. For the reasons which follow, we affirm.

DISCUSSION OF THE RECORD
On April 10, 1993, plaintiff, William "Scott" Hawthorne (Scott) and defendant, Virginia Whitfield Hawthorne (Virginia) were married. On February 18, 1994, the couple separated when Virginia, who was then approximately two months pregnant, left their home in Monroe, Louisiana. One month later, Scott filed for a divorce under La.Civ.Code art. 102 and moved to Natchitoches, Louisiana to be near his parents.
On July 8, 1994, Scott filed a motion requesting the trial court to enter a judgment (1) decreeing separation of property and (2) ordering disclosure of information about Virginia's pregnancy. The trial court subsequently signed a consent judgment that terminated the regime of community property; ordered any physician delivering health care services to Virginia with respect to her pregnancy to provide Scott with copies of all documents and records relating to the child and to communicate freely with him concerning the child; and directed Virginia to notify Scott when she went to the hospital to give birth to the child.
On September 20, 1994, Virginia gave birth to Jonathan Ryan Hawthorne. About three weeks later, Scott filed a rule to show cause concerning custody and support. Specifically, Scott asserted that it was in the best interest of the child that he be given permanent sole custody of the child and that Virginia be granted reasonable visitation privileges. On October 11, 1994, the trial court signed a judgment of divorce pursuant to La.Civ.Code art. 102. Approximately one month later, Virginia answered Scott's rule to show cause and requested that she be given sole custody of their son with Scott having reasonable visitation privileges.
*621 On December 16, 1994, Scott filed a rule to show cause requesting that he be given reasonable visitation rights with his son until the trial court rendered a judgment pertaining to permanent custody. Scott asserted that Virginia was refusing to allow him to have visitation with his son. Six days later, the trial court rendered judgment setting forth Scott's visitation privileges with the child.
A trial on the merits on the issue of custody was held on January 30 and 31, 1995. On April 17, 1995, the trial court rendered judgment granting joint custody of the child to Scott and Virginia. The trial court further ordered that Virginia would be the temporary domiciliary parent and that Scott and Virginia make a diligent attempt to work out a visitation schedule. Finally, the trial court reserved continuing jurisdiction with regard to the custody decree. Regarding this issue, the trial court stated:
The court wants continuing jurisdiction in this matter to ensure that these games of keep-away with this child end immediately. This court will consider that Mrs. Hawthorne does not have the best interest of this child in mind if she continues to impede her former husband in the exercise of his visitation privileges.
On the same day that the trial court rendered judgment, Scott filed a motion for a new trial contending that the judgment was contrary to the law and evidence. The trial court granted Scott's motion on May 8, 1995, and also ordered that custody of Jonathan would be rotated between Scott and Virginia in successive two-week intervals until a final judgment after the new trial. The trial court ordered that the new trial be held on June 16, 1995.
On June 2, 1995, Virginia filed a notice that she would be taking the depositions of Steve Tew, Virginia's trial attorney, and Dr. Elaine Fichter. In response, Scott filed a motion in limine and a motion to quash the depositions. A hearing on these discovery matters was held on June 16, 1995. The trial court subsequently granted Scott's motion in limine prohibiting the parties from calling any witnesses with regard to any events which occurred prior to the original trial. The trial court then set the date for the new trial on August 7, 1995.
On July 17, 1995, Virginia filed a motion to recuse Judge John Whitaker from the new trial. Virginia alleged that Scott's mother, Dee Hawthorne, was a prominent lawyer in Natchitoches and practiced frequently in Judge Whitaker's court. Because of this fact, Virginia asserted, it was "impossible" for Judge Whitaker not to be prejudiced and biased in the case. A hearing on this motion for recusal was held on August 1, 1995 before Judge W. Peyton Cunningham, Jr. After the hearing, Judge Cunningham recused himself and Judge Whitaker from the new trial. At that point, Scott applied for writs to this court. On August 5, 1995, in Hawthorne v. Hawthorne, 95-1018, we granted the writ and held:
The trial court erred in granting respondent's "Motion for Recusal". Respondent failed to prove that Judge John B. Whitaker is biased, prejudiced, or interested in the cause or outcome. La.C.C.P. art. 151. Accordingly, the trial court's judgment is reversed and set aside.
IT IS ORDERED that the matter proceed to trial as previously scheduled with Judge John B. Whitaker as the presiding judge.
Virginia then filed for writs with the Louisiana supreme court. However, the supreme court subsequently denied her writ application.
At the new trial, the trial court acknowledged that it did not rule according to the "law and evidence." The trial court further stated that the law and evidence was clear that it was in the best interest of Jonathan to be in the custody of Scott. On September 7, 1995, the trial court rendered judgment awarding joint custody and designated Scott as the domiciliary parent. The trial court further awarded Virginia visitation in the summer: Mother's Day weekend, two weeks in June, two weeks in August. The trial court then ordered that Scott and Virginia alternate the holidays of Thanksgiving, Christmas, New Year's and Easter. The trial court also ordered that these holidays would be divided in half, therefore, Scott and Virginia would rotate the actual halves. Finally, the trial court (1) ordered that Virginia *622 pay $220.00 per month in child support to Scott; (2) ordered that Virginia pay 22% and Scott pay 78% of Jonathan's non-covered medical and dental expenses; (3) found that Virginia was at fault for the divorce and, as such, was not entitled to alimony; and (4) assessed Virginia with the costs of the proceeding.
Virginia appeals from that judgment and asserts that the trial court erred in (1) denying the parties the right to put on any testimony at the new trial; (2) granting Scott's motions in limine; (3) granting Scott's motion to quash the subpoena for Stephen Tew; (4) refusing to take the testimony of Deborah Geffcoat; (5) assessing Virginia with the court costs; (6) awarding domiciliary custody to Scott; (7) not setting weekend visitation and in limiting visitation during the summer; and (8) not permitting her to supplement the appellate record. Virginia also asserts that Judge John Whitaker should have been recused from handling the new trial.

LAW

NEW TRIAL
Virginia argues that the trial court erred when it reversed itself at the new trial without taking any evidence. In support of her argument, Virginia relies on Lemalle v. Winn Dixie, Inc., 452 So.2d 414 (La.App. 3 Cir.1984), writ denied, 456 So.2d 1002, and Mitchell v. Windham, 426 So.2d 759 (La.App. 3 Cir.1983).
"A new trial may be granted, upon contradictory motion of any party or by the court on its motion, to all or any of the parties and on all or part of the issues, or for reargument only." La.Code Civ.P. art. 1971. Pursuant to Article 1971, the trial court has the power to define and limit the scope of the new trial. Russell v. McDonald's Corporation, 576 So.2d 1213 (La.App. 5 Cir.1991), citing Devillier v. Traders & General Insurance Company, 321 So.2d 55 (La.App. 3 Cir. 1975), writ denied, 325 So.2d 273 (La.1976). Once the trial court grants a new trial, it shall be assigned for a hearing in accordance with the rules and practice of court. La. Code Civ.P. art. 1977. "When a new trial is granted for reargument only, no evidence shall be adduced." La.Code Civ.P. art. 1978.
In the present case, after hearing arguments on Scott's motion for a new trial, the trial court granted his motion. In granting the motion, the trial court stated in part:
This doesn't need to be.... this doesn't need to be a major production. I just want to know what's happened since Mrs. Hawthorne was given.... made the domiciary (sic) parent of this child. I want to know what Mr. Hawthorne has done. And I want to know how things have gone since then. That's all I'm interested in.
* * * * * *
Prior counsel and Ms. Gregorie put on extensive evidence earlier. I think I've got all that. I don't want to hear that again. That was.... they sat in here all day long talking ugly about each other. I just don't want to hear anymore of that.
The trial court eventually set the new trial for August 7, 1995.
At the start of the new trial, the trial court observed:
Okay. Now this young couple.... I'm going to.... I'm not going to hear any further evidence. And I'm going to admit and apologize to all the parties here present and to all the lawyers that I was in error. This court did not rule according the law and the evidence. Mrs. Hawthorne was breast-feeding the baby. The law was clear.... the law and the evidence was clear that it was in the best interest of this child to be in the custody of Mr. Hawthorne.
* * * * * *
But I think that that was.... that would have been.... we actually are.... we have had the motion for new trial, but it's going to be for reargument only. I mean, it has been for reargument only, and I'm just simply telling everybody here on the record and in the glare of the public that I made a grave error when I originally rendered this judgment.
The record clearly substantiates that the trial court had the entire record from the earlier proceedings, heard arguments on the *623 merits on the custody decree on Scott's motion for a new trial, and set the new trial for a hearing on August 7, 1995. We find that Lemalle, 452 So.2d 414 and Mitchell, 426 So.2d 759 are not controlling in this case. After a close reading of Lemalle and Mitchell, we conclude that those two cases only hold that when a trial court grants a new trial, the trial court cannot immediately proceed to render another judgment. Instead, the trial court must set the case for another hearing in accordance with the rules and practices of the court. In the case sub judice, the trial court clearly recognized at the new trial that it did not rule according to the law and the evidence and that the new trial was just for reargument. The trial court did not err procedurally by unilaterally changing its judgment on the motion for the new trial as in Lemalle and Mitchell. Further, we do not believe that Virginia was deprived of any rights nor prejudiced by the manner in which the trial court handled the new trial. See Russell, 576 So.2d 1213. Therefore, we conclude that this assignment of error is without merit. Finally, because of our disposition of this issue, Virginia's assignment of errors 2 and 3 are now moot because they both specifically address the propriety of the trial court's procedure in the new trial.

TESTIMONY OF DEBORAH GEFFCOAT
Virginia asserts that the trial court erred in deciding that certain testimony of Deborah Geffcoat, who was married to Scott from 1985 through 1988, was irrelevant. Relevant evidence means evidence that has any tendency to make the existence of any fact that is of consequence to the litigation more probable or less probable than it would be without the evidence. La.Code Evid. art. 401. "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible." La.Code Evid. art. 402. Whether evidence is relevant is within the discretion of the trial court and that ruling will not be disturbed by an appellate court in the absence of a clear abuse of discretion. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, 92-1545 (La.App. 1 Cir. 3/11/94), 634 So.2d 466, writ denied, 94-0906 (La. 6/17/94), 638 So.2d 1094; Dubois v. State, Through Department of Public Safety, 466 So.2d 1381 (La.App. 3 Cir.1985).
In the present case, when Deborah Geffcoat was being examined by Virginia's attorney, Deborah stated that she was married to Scott from 1985 until 1988. Then the following colloquy took place:
Q. Okay. Did Mr. Hawthorne bring any pornographic material into your house....
MS. GREGORIE: Your Honor, I object to the relevance.
MR. TEW: Well....
MS. GREGORIE: He specifically said her house. We're talking about Ginger (Virginia) and Scott's house.
THE COURT: We're talking about.... do you know anything about the marriage between your former husband and this defendant? Do you know anything about that, were you ever around them.
A. No.
THE COURT: Okay. So you don't know anything about them.
A. No.
THE COURT: Your relationship with him terminated at the end of the marriage?
A. Yes.
* * * * * *
THE COURT: And the objection was that that was another marriage. And I think I've got to sustain that objection. What happens here, the Court always has to be very suspicious of testimony from former spouses. I can assure you that if your client had a former spouse here that wanted to talk ugly about her, I'm not going to let that happen either. And I think that the.... I just don't think that it's got enough relevance on this relationship that I can....
We conclude that the trial court did not clearly abuse its discretion in finding this testimony irrelevant. Further, the record substantiates that Virginia wanted to proffer evidence that Scott had brought pornographic magazines into Deborah's house while they were married. This was the same assertion *624 that Virginia made in the present case, that is, Scott was addicted to pornography. However, character evidence is inadmissible to prove that a person acted in conformity therewith on a particular occasion. La.Code Evid. art. 404. Therefore, we find that this assignment of error lacks merit.

COURT COSTS
Virginia argues that the trial court erred in ordering her to pay the costs of the proceedings. She specifically asserts that she did not cause the proceedings to be protracted, complicated and costly. As such, Virginia insists, Scott should be assessed with the costs.
A trial court may assess costs of litigation in any equitable manner, however, the general rule is that the party cast in judgment should be taxed with the costs of litigation. La.Code Civ.P. art. 1920; McConathy v. McConathy, 25,542 (La.App. 2 Cir. 2/23/94), 632 So.2d 1200, writ denied, 94-0750 (La. 5/6/94), 637 So.2d 1052. Article 1920 has been liberally interpreted as granting the trial court broad discretion in apportioning costs as it deems equitable. Doe v. Roman Catholic Church, 94-1476 (La.App. 3 Cir. 5/3/95), 656 So.2d 5, writ denied, 95-2076 (La. 11/13/95), 662 So.2d 478.
We recognize that when the trial court rendered its first judgment on April 17, 1995, it did assess costs of the proceeding against Virginia because the trial court felt she "converted a routine rule nisi into protracted, complicated and costly litigation." However, when the trial court granted Scott's motion for a new trial, the original judgment was vacated. Abney v. Allstate Insurance Company, 442 So.2d 590 (La.App. 1 Cir.1983). Further, when the trial court rendered its final judgment after the new trial, it, again, assessed court costs against Virginia. But, the trial court also ordered that each party would have to pay for the costs of their respective experts. In that judgment, Scott was the successful litigant as he was awarded domiciliary custody of Jonathan. Therefore, we cannot conclude that the trial court abused its discretion in casting Virginia with the court costs. We find this assignment of error lacks merit.

CUSTODY
The Louisiana Civil Code articles pertaining to child custody were revised, amended, and re-enacted by Acts 1993, No. 261, § 1, and became effective on January 1, 1994. "Acts 1993, no. 261 does not apply to actions for separation from bed and board or divorce or actions for incidental relief commenced before January 1, 1994, or to reconventional demands thereto, whenever filed. Such actions are to be governed by the law in effect prior to January 1, 1994." La.R.S. 9:387. In the present case, Scott filed his motion for custody on October 6, 1994. Therefore, the revised Civil Code articles are applicable.
The trial court shall award custody of a child in accordance with the best interest of the child. La.Civ.Code art. 131. The best interest of the child is the "overriding test" to be applied in all child custody cases. La. Civ.Code art. 131, Comment (a). If the parents reach an agreement regarding who is to have custody of the child, the court shall award custody in accordance with that agreement unless the best interest of the child requires a different award. In the absence of such an agreement, or if the agreement is not in the best interest of the child, the court shall award custody of the child to the parents jointly. However, if one parent proves by clear and convincing evidence that sole custody is in the best interest of the child, the court shall award custody to that parent. La.Civ.Code art. 132. "This latter provision is intended to strengthen the preference of joint custody in former Civil Code Article 131(A)."[1] La.Civ.Code art. 132, Comment (b).
La.Civ.Code art. 134 states that the court shall consider all relevant factors in determining the best interest of the child. Article 134 provides that such factors may include:

*625 (1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
Article 134 preserves the list of factors formerly found in Article 131(C)(2), but "changes their import." Under former Article 131(C)(2), the listed factors were considered by the court in determining whether the presumption in favor of joint custody was rebutted. Under the revision, the listed factors are simply provided as a guide to the court in making the fundamental decision as to what custody disposition is in the best interest of the child. La.Civ.Code art. 134, Comment (a). The listed factors are nonexclusive and the trial court is given discretion as to the weight to be given to each factor. La.Civ.Code art. 134, Comment (b). Comment (c) provides in part that:
The illustrative nature of the listing of factors contained in this Article gives the court freedom to consider additional factors. See Turner v. Turner, 455 So.2d 1374 (La.1984) (court allowed, even obligated, to consider additional factor of inability of parents to get along).... In general, the court should consider the totality of the facts and circumstances of the individual case. Theriot v. Huval, 413 So.2d 337 (La.App. 3d Cir.1982).
The trial court is in a better position to evaluate the best interest of the child from its observances of the parties and witnesses; thus, a trial court's determination in a child custody case is entitled to great weight on appeal and will not be disturbed unless there is a clear abuse of discretion. Cooley v. Cooley, 94-251 (La.App. 3 Cir. 10/5/94), 643 So.2d 408; Mayeux v. Mayeux, 93-1603 (La. App. 3 Cir. 6/1/94), 640 So.2d 686.
Before we begin our review of the evidence regarding custody, we note that the trial court's custody decree is couched in terms of "joint custody" with Scott having domiciliary custody and Virginia receiving limited visitation privileges. However, we find that the custody decree, in reality, is a decree which grants sole custody of Jonathan to Scott. See Christian v. Christian, 535 So.2d 842 (La.App. 2 Cir.1988). Therefore, we will conduct our review of the following evidence, which was adduced at trial, in the light that Scott was awarded sole custody of Jonathan.
Scott testified that during their marriage, Virginia accused him of having affairs, having sex with his sister, and that he was addicted to pornography. Scott alleged that Virginia has a drinking problem. Scott unequivocally testified that Virginia did not share any information with him about her pregnancy. In fact, he stated that she told him the baby "was none of his business"; that he would never know anything that happened to the baby; and that she would make sure the baby would grow up to hate him and his family. Scott further testified that he was not called when Virginia went to the hospital *626 to deliver the baby. He indicated that he found about the birth of Jonathan when he called the hospital and then faxed them Judge Whitaker's court order mandating that Virginia call him when she went to give birth.
When asked about his relationship with Jonathan, the following colloquy took place:
Q. You testified that your former wife Mrs. Hawthorne won't let you have or has not let you have a relationship with your son, is that correct?
A. She's.... it's extremely difficult, yes.
Q. She has not let you have the child overnight, is that correct?
A. Not by her choice, no.
Q. Well why would.... then what reason did she let you have the child overnight?
A. I would have to assume after we had the depositions, the discussion that all of us had. I'm not sure what she based her decision on, but she wouldn't come to any agreeable situation then. The only time that she came to an agreeable situation was when we were supposed to be in court the next day to decide that fact.
* * * * * *
THE COURT: Let the minutes reflect that counsel of both these parties had a conference in chambers with the Court. And the Court advised them that it was going to order visitation if they couldn't agree on it and asked counsel to try to work out a visitation arrangement, because it normally works better if the parties work it out. But the Court was going order it if they could not work it out. I want the brethren above to know.... be aware of that.
Scott testified that he is employed at Northwestern State University in Natchitoches, Louisiana as an environmental health and safety officer. He stated that he works Monday through Friday from 8:00 a.m. until 4:30 p.m. He further stated that he lives in a three bedroom, two bathroom house with his grandmother. But, he noted that he was planning to move next door to his parents when they finished building their house. He testified that his new house would be a two bedroom, two bathroom, with a small kitchen and living room. Scott indicated that he has made arrangements with Audrey Roberson to watch Jonathan while he is at work. Finally, Scott testified that Virginia should have input in Jonathan's life and that it is important for both parents to contribute in raising the child.
Virginia testified that the reason the marriage broke up was because Scott was (1) bringing pornography into the house; (2) calling 1-900 numbers; (3) making demands for unusual sex; and (4) lying and hiding things from her. Virginia stated that she wants Jonathan "to know his father." However, she acknowledged that after she left Scott, she informed her OB/GYN not to release any information to him regarding her pregnancy. She further admitted that the only way Scott received any information about her pregnancy was after he obtained a court order. She further testified that she violated the court order when she did not call Scott to inform him that she was going to the hospital to give birth to their child. Virginia stated that, the day before Jonathan was born, Scott had called her repeatedly and left messages on her answering machine. However, she noted that she did not want to talk to him.
Virginia testified that she lives with her mother in Monroe, Louisiana in a two bedroom, two bathroom house. At trial, she stated that she was unemployed, but that she was looking for full time employment. In fact, at the new trial, it was established that she was employed full time. Virginia testified that she worked at the Department of Corrections, LTI, in Monroe from May 1993 until September 1994. She stated that she resigned; however, she acknowledged that LTI's records revealed that she had committed payroll fraud, but she insisted that it was a "misunderstanding." Finally, Virginia admitted that while she was working on her masters in psychology at Northeast Louisiana University, she was accused of plagiarism twice when she was writing her thesis.
Audrey Roberson testified that she was the maid for Scott's grandmother, Estelle Hawthorne. She further testified that she works at Scott's house Monday through Friday, *627 9:00 a.m. until 5:00 p.m. She also stated that she was married to the Reverend Robert Peter Roberson, Jr. and that she has raised five children of her own. She stated that she would be the care giver to Jonathan while Scott was at work.
Harry Hawthorne, Scott's father, testified that he went with Scott to Monroe after the break-up of the marriage to help Scott collect his property from the marital dwelling. Harry stated that when they were loading the U-Haul, Scott called Virginia to get a key to the storage room. At that point, Harry noted, Virginia must have called the police because two city policemen soon arrived and accused them of stealing property from the house. Harry testified that Scott then called Virginia and she then came and looked into the U-Haul and told the police that the property belonged to Scott.
Dee Hawthorne, Scott's mother, testified that Virginia accused Scott during their marriage of being bulimic and having affairs. She also asserted that Virginia had a drinking problem and a very bad temper. This same assertion was made by Cindy Hawthorne, Scott's sister-in-law. Cindy also testified that Scott was the godfather of her daughter, Danielle, and that Scott was very patient with her and was her "best buddy."
Marilyn Moore, Scott's aunt, testified that she is the owner of Continental Windshield Repair and that Scott worked for her during his marriage. She further stated that Scott did a lot of traveling while working for her. Marilyn also alleged that Virginia had a drinking problem. She noted that on one occasion Scott had to stay in Baton Rouge, Louisiana for the night because the weather was terrible. She stated that Scott stayed with his sister, Debra. When asked what happened that night, Marilyn replied:
Well I'm over at Debra's house, and Ginger (Virginia) starts calling. And I cannot hear exactly what she's saying, but I'm standing at the other end of the apartment and I can hear her absolutely shrieking at the top of her lungs about why he wasn't coming home to her. And it was not an issue of that he didn't love her that he wasn't coming home, he wasn't coming home because it was not safe for Scott to get on the road and to come home. She called him three times while I was there, I was there for an hour and a half. And each time it was just this bazaar [sic] screaming and ranting and raving until he would say, "Ginger, I can't talk to you like this." And he would hang up. And, you know, ten minutes later she was back shrieking again.
Todd Patterson, who lived across the street from Virginia and Scott when they were married, testified that he would often act as a "third party" after they separated. He further testified that Virginia told Scott that he would not see the baby and that the baby would grow up to hate him. When Jonathan was born, Todd stated that he went to the hospital with Scott to see the baby. Todd testified that they took pictures of the baby; however, he unequivocally stated that Scott was not allowed to hold the baby and that Scott's visit was cut short because the police informed him that Virginia did not want him there.
Jolene Whitfield, Virginia's mother, testified that Virginia lives with her in a two bedroom house and that she is planning to expand her house. Jolene further testified that she works at McRae's Fine Jewelry twice a week at night. Jolene stated that she helps her daughter to take care of Jonathan and that Virginia "takes good care" of her son. Dixie Hall, a friend of Virginia's, also confirmed that Virginia takes good care of Jonathan.
Dr. Paul D. Ware, an expert in psychiatry, neurology, and forensic psychiatry, testified that he saw Virginia on May 29, 1994. After personal observations and testing, Dr. Ware diagnosed that Virginia suffered from "borderline personality disorder." Dr. Ware described this disorder as a "pervasive pattern of instability of interpersonal relationships, self image and affects, and marked impulsivity beginning by early childhood." Dr. Ware noted that to make a diagnosis of personality disorder it "must be so ingrained that it permeates that person's personality to such a degree that it significantly affects the way they live their life and the way they respond to situations in their life."
*628 Dr. Ware testified that there is always a possibility that a person with borderline personality disorder "under pressure and in special situations of stress, particularly in the relationship stress, that the person will misperceive, they will lose control, they will lash out uncontrolled anger (sic), and they will be vindictive in getting back at (sic), and they can dissociate or decompensate to a level where that temporarily they really are not aware of what's going on around them." When Dr. Ware was asked how this personality disorder would affect Virginia's relationship with her child, the following colloquy took place:
Q. Is it also possible that she will project any anger she has left towards Mr. Hawthorne at this baby?
A. Yes. That's one of actually the biggest concerns in regard to parenting is the projection of the anger that she feels toward Mr. Hawthorne onto the child. And I do not believe she has the ability to really accept and appreciate that Mr. Hawthorne is the father of this child and he can love this baby regardless of what his feelings now may be towards her. But she cannot separate, in my opinion, her feelings around him and look at the child as his son. She sees Scott in that whole picture and has never been able to separate that out. She couldn't understand why he would want to see his son or be involved in knowing when he was born, because of how he felt about her and he wasn't being attentive to her, with absolutely no ability to separate those two in terms of regardless of what's happening in their relationship. She got pregnant by Scott, she had a child by Scott, and this is his child as well as her child.
Dr. Ware testified that a person with personality disorder sees that child as their possession and, as such, will become overprotective, overnurturing, and rescuing. He further testified that if the child does not respond in the way that person desires, they will react with rage and withdraw. Dr. Ware then stated that there were two features of borderline personality disorder that would make Virginia a risk to the child:
I would say, one, her confusion of boundaries, so that she will view the child as an extension of herself and not being able to stay separate in terms of boundaries. Two, and more important than anything else, the intensity of her emotional state, which she cannot control, so that under stress the child will have to feel that emotional state and will have to feel that rage and will have to learn how to avoid that and to not upset his mother and stay away from her when she's in that kind of state.
Dr. Ware testified that he saw Scott approximately ten times. Dr. Ware opined that Scott was "immature" but was "certainly further along" in his personal development than Virginia. Dr. Ware also stated that Scott does not have a personality disorder nor an eating disorder. When Dr. Ware was asked how Scott related to children, he replied:
He seems to care for children and relates well with children. And I'm not aware of any behavior suggesting that he has difficulty with children. I think one pretty good rule of thumb I have about that type thing is to relate it to how a person relates to the elderly. And Scott's probably more emotionally attached to and loving to his grandmother than anyone else, and cares about her.... appears to me to care about her dearly. And he relates to her with real tenderness and caring.
Dr. Ware further testified that after a child reaches eighteen months and, especially the age of two, that child needs significant contact with the parent of their sex so that they can begin the identification process. Finally, Dr. Ware opined that it would be in Jonathan's best interest for Scott to have custody. Specifically, he stated in part:
I do believe that Scott, with his extended family, has the best ability to offer more stable parenting to the child. I guess it's not my opinion as to how that should be. I guess if I would have to say.... I would have to suggest that he be the domiciliary parent with visiting privileges appropriate (sic). I don't believe, as long as Ginger (Virginia) remains the domiciliary parent, he will ever have normal visitation with his child, I don't care what the Court or anybody says.
*629 Dr. Bobby Stephenson, a psychologist, testified that he tested and interviewed Scott and Virginia. Dr. Stephenson stated that Virginia gets "emotional fairly quickly" and that she has a pattern of "being quick to anger" and "being somewhat volatile at times and explosive." He opined that Virginia's difficulty has been primarily with adults and that he did not see a "major risk" that Virginia would harm Jonathan. But, Dr. Stephenson did acknowledge that Virginia suffers from anxiety when dealing with males. Regarding Scott, Dr. Stephenson opined that he was immature and has traits of suspiciousness and distrust.
Regarding the child, Dr. Stephenson testified that Jonathan needs to have a relationship with both parents. At trial, he opined that the primary domicile needed to be with the mother, since at that point, Jonathan needed nurture, security, and support which he felt could be best handled by the mother. However, Dr. Stephenson agreed with Dr. Ware that, as Jonathan gets older, the role of the father becomes "more significant" and that the father needs a "significant role" in the relationship with the child. Because of this, Dr. Stephenson recommended a "phased in visitation plan with the father" as Jonathan became older. Finally, Dr. Stephenson testified that Scott and Virginia have "not been able to share their joint feelings and concerns about what's in this child's best interest and in terms of developing skill and knowledge about how to care for him."
Pam Neman, a Professor of Counseling, Educational Psychology, at Northwestern State University in Natchitoches, Louisiana, testified that she is on the Licensure Board for Mental Health Counseling for the State of Louisiana. She stated that children need both parents in their lives. She also noted that since Jonathan is a male, he will need "that male role model significantly" in his life. When asked about her expert opinion concerning custody of the child, the following colloquy took place:
Q. Okay. Can you tell us what importance is of Mr. Hawthorne's extended family and how it relates to this issue?
A. Yes, I think he's from a very stable, caring, loving extended family. And I think that that probably would make him a very good primary care giver. He has a wide range of people that would be in the child's life, mother, father, grandmother, grandfather, great-grandmother, aunts and uncles. It would give the child a wide range of experiences and love from a lot of different individuals.
Q. Okay. Is there any basis that there should be a maternal preference for this child?
A. I think ordinarily, and I think this was brought out in testimony, people would be inclined to go with the parent, if everything was equal, where the child had been most of the child's life, whether that happened to be the mother or whether that happened to be the father. But I think in this particular case there are some extenuating circumstances that make me question whether the child is possibly in danger physically and emotionally. And I think....
Q. In danger where?
A. In danger?
Q. In danger where, with who?
A. With the mother....
Q. Okay.
A..... at the primary residence. I'm not.... I just.... you know, I keep hearing what everyone has said and the profile that I see here. And I question whether she would be able to really control her emotions around this child physically, if this child reminded her of Scott and did something that she didn't like. And then in addition to that I'm more concerned about any emotional berating that might happen to this child. I also feel that it's very important that the child have both parents. And I wonder how cooperative she would be in allowing open and ample visitation, because that's not the profile of the personality that's been described here. The personality that's been described here is a very controlling one.
After hearing all the evidence, the trial court, in its reasons for judgment, stated in part that:

*630 Mr. and Mrs. Hawthorne discontinued living together as man and wife during the early stages of her pregnancy and their relationship has been marked by charges and counter-charges too numerous and too unpleasant for this court to want to recount in detail at this time. Any reviewing court will have the benefit of the lengthy verbatim transcript for reference should this matter be reviewed by the learned brethren above. Despite all the unfavorable things the parties had to say about one another the testimony, as a whole, has shown that Mrs. Hawthorne is afflicted with a personality disorder which manifests itself with screaming and prolonged fits of rage. During her pregnancy and following the birth of this child she had gone to extremes of non-communication to prevent Mr. Hawthorne from first, knowing of the birth of his child and then in preventing him from getting to know his child or even to see his child. In addition, Mrs. Hawthorne has engaged in several seriously irrational acts which could have had no other purpose than vindictiveness towards her husband. In addition, she has engaged in some acts which seriously bring her honesty and integrity into question. These acts of fraud and plagiarism are well documented in the record. Mrs. Hawthorne has likewise shown an unhealthy vindictiveness in playing keep-away with the child of the marriage to the point that her conduct has many earmarks of insanity. She has apparently derived an immense perverse pleasure from the control she can exercise over her former husband because of his desire to visit with the child of their marriage. Mrs. Hawthorne manipulated her husband to the maximum degree because the child could be used both as a ring in his nose and a bludgeon for his head. She refused to permit him to visit the child at all until a court hearing on visitation was imminent, then she relented because it was obvious he would win visitation rights. However, in court she testified, under oath, that it was unnecessary for him to sue for visitation.
We find that Virginia and Scott have a history of severe animosity between them and that they have not communicated at all regarding their child. It is well settled in our jurisprudence that for joint custody to work, each parent must be willing to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent. Where the parties' testimony reveals that sufficient animosity and rancor exist between them such that they cannot work together to the extent required in a joint custody arrangement, the courts have awarded sole custody. See Watermeier v. Watermeier, 504 So.2d 856 (La. 1987); Ard v. Ard, 628 So.2d 1221 (La.App. 3 Cir.1993); Goodwin v. Goodwin, 618 So.2d 579 (La.App. 2 Cir.), writ denied, 623 So.2d 1340 (La.1993); Long v. Long, 458 So.2d 662 (La.App. 3 Cir.1984). Therefore, after a thorough review of the record and the factors listed in La.Civ.Code art. 134, we conclude that the trial court did not clearly abuse its discretion in its custody award. Thus, we find that this assignment of error is without merit.

VISITATION
Virginia also argues that the trial court erred in not granting her weekend visitation and in limiting her visitation during the summer months. We disagree.
"A parent not granted custody or joint custody of a child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would not be in the best interest of the child." La.Civ. Code art. 136(A). The paramount consideration in setting visitation privileges for the non-custodial parent is the best interest for the child. Barberousse v. Barberousse, 556 So.2d 930 (La.App. 3 Cir.1990). In setting visitation, each case must be judged on its own facts and circumstances. Id. The trial court has great discretion in setting visitation privileges and its determination will be not disturbed by an appellate court in the absence of manifest error. Duvalle v. Duvalle, 27,271 (La.App. 2 Cir. 8/23/95); 660 So.2d 152.
As previously stated, the trial court granted Virginia visitation two weeks in June, two weeks in August, and the Mother's Day weekend. Further, the trial court ordered *631 that Scott and Virginia would alternate the holidays of Thanksgiving, Christmas, New Year's, and Easter. The trial court ordered that the holiday time be divided into half with the halves being alternated so that Scott and Virginia would rotate the actual halves. For the reasons in our custody discussion, we conclude that the trial court was not manifestly erroneous in awarding these visitation privileges to Virginia. Therefore, we find that this assignment of error lacks merit.

SUPPLEMENTING OF THE RECORD
On October 11, 1995, Virginia filed a "Motion To Supplement Record For Appeal Purposes To Include Discovery Not Previously Filed." Specifically, Virginia wanted to include interrogatories directed to Scott to specify the dates, times and places of visitation with Jonathan since the original trial on the merits (January 30 and 31, 1995). However, the trial court denied this motion and stated:
Motion denied. Although the court, at one time, intended to consider conduct of the parties subsequent to the original trial, the court reconsidered and rendered its verdict based on the evidence taken at the trial only.
Virginia then filed a writ application with this court. On December 19, 1995, in Hawthorne v. Hawthorne, W95-1546, we denied the writ and stated: "We find no error in the trial court's ruling." In the present case, on appeal, Virginia asserts the same issue.
We conclude that our denying the writ is the "law of the case" on that issue. See Guilbeaux v. Times of Acadiana, Inc., 94-1270 (La.App. 3 Cir. 8/9/95); 661 So.2d 1027; Easton v. Chevron Industries, Inc., 602 So.2d 1032 (La.App. 4 Cir.), writ denied, 604 So.2d 1315, 1318 (La.1992); First Federal Sav. & Loan v. Disiere, 542 So.2d 11 (La.App. 4 Cir.1989), writ denied, 548 So.2d 311; Mihalopoulos v. Westwind Africa Line, Ltd., 511 So.2d 771 (La.App. 5 Cir.1987). In First Federal Sav. & Loan, 542 So.2d at 13, the fourth circuit explained the concept of the "law of the case" as follows:
It has been held that this principle applies to all decisions of an appellate court and not merely those arising from the full appeal process. (citations omitted.)
One of the reasons for application of the "law of the case" rule is to avoid indefinite relitigation of the same issue. (citations omitted.)
The "law of the case" doctrine should not be applied where to do so would accomplish an obvious injustice, or where the former appellate decision was clearly, palpably or manifestly erroneous. [Citation omitted.]
In the present case, we cannot conclude that our former decision was manifestly erroneous nor that our refusal to reconsider this matter would be an obvious injustice. Therefore, we find that this assignment of error is without merit.

RECUSAL
Virginia argues that Judge John Whitaker should have been recused from the new trial. However, as previously stated, after Judge Peyton Cunningham recused Judge Whitaker and himself, we granted writs and reversed that decision. Additionally, Virginia sought writs with the Louisiana Supreme Court from our decision and the supreme court denied the writ. Therefore, we conclude that our ruling in granting the writ is the "law of the case." Further, we conclude that our decision was not manifestly erroneous and that our refusal to reconsider this matter would not be an obvious injustice. Thus, we find that this assignment of error is without merit.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed against Virginia Whitfield Hawthorne.
AFFIRMED.
NOTES
[1] Former La.Civ.Code art. 131 provided that there was a rebuttable presumption that joint custody was in the best interest of the minor child. The presumption of joint custody could be rebutted by showing that it was not in the best interest of the child after considering an illustrative list of factors in former Article 131(C)(2).