NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-1075

ERIC QUATTLEBAUM

VERSUS

WENDY NOEL GLENN QUATTLEBAUM

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 251,141
HONORABLE THOMAS MARTIN YEAGER, DISTRICT JUDGE

**********

DAVID KENT SAVOIE
JUDGE

**********

Court composed of Jimmie C. Peters, Marc T. Amy, and David Kent Savoie, Judges.

AFFIRMED.

**Michael H. Davis**
**Law Office of Michael H. Davis**
**2017 MacArthur Drive**
**Building 4, Suite "A"**
**Alexandria, LA 71301**
**(318) 445-3621**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Wendy Noel Glenn Quattlebaum**

**Susan Ford Fiser**
**P.O. Box 12424**
**1630 Metro Drive**
**Alexandria, LA 71315-2424**
**(318) 442-8899**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
**Eric Quattlebaum**

**SAVOIE, Judge.**

Defendant/Appellant, Wendy Quattlebaum, appeals the trial court's custody judgment. For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

This matter involves a custody dispute between Appellant, Wendy Quattlebaum (Wendy), and Appellee, Eric Quattlebaum (Eric), regarding their three minor children: five-year-old Augustus (Gus), four-year-old Call, and eighteen-month-old Presley. On September 25, 2014, Eric filed a petition for divorce alleging that Wendy was having an affair. Wendy also filed a petition for divorce on October 15, 2014. The trial court initially heard the matter on October 21, 2014.

The parties were married for six years. They lived in a home that they rented located in Pineville, Louisiana for three to four years. They lived about five miles from Eric's aunt, Mary Lagrange (Ms. Lagrange), and Eric's father, Sammy Quattlebaum (Mr. Quattlebaum). They separated after Wendy was served with the petition for divorce. Following the separation, Eric continued to live in the rented home, while Wendy and the children stayed with various relatives and friends in Jonesville.

Eric was a welder and millwright. He testified that he worked Monday through Thursday for approximately ten hours per day, and occasionally overtime. He would leave his home for work by 5:15 a.m. and then return home around 5:15 p.m. He also indicated that he would sometimes work at home until 8:00 p.m. or 9:00 p.m. splitting wood, welding, or doing odd jobs for the landlord.

Wendy was a stay-at-home mom. While she is physically capable of working and had held jobs in the past, she testified that, during their marriage, she

and Eric had decided for her to stay home so that their children did not have to attend daycare.

There was testimony indicating that, prior to the parties' separation, Wendy would routinely drop off two of the three children with Ms. Lagrange, between two and four times per week for between two and six hours at a time in order to run errands. Wendy testified that she and Ms. Lagrange were "best friends" and that they saw each other almost daily. Ms. Lagrange uses a wheelchair, and Mr. Quattlebaum testified that he would often help Ms. Lagrange with the children. Ms. Lagrange testified that the children were well behaved and that she had no problem taking care of them. However, after the parties separated, the children had not stayed with Ms. Lagrange or Mr. Quattlebaum.

The parties presented conflicting testimony and evidence against each other in efforts to obtain custody. Eric presented pictures of the family home reflecting left-over food and dirty dishes left out in the kitchen, unfolded clothes covering the sofa, and the general disarray of the home. He also took issue with the type of food Wendy fed to the children, her lack of cooking and cleaning, and suggested that Wendy would curse in front of the children. He further presented evidence, including Wendy's own testimony, that Wendy had an affair with another man during times when she had dropped off the children with Ms. Lagrange, and how Wendy refused his efforts to try to save the marriage despite the affair. Eric also presented testimony in efforts to prove that Wendy was speaking negatively to the children about him. In addition, Eric testified as to his belief that Wendy had intentions to move the children out of the parish to Jonesville where Wendy's family was located, and he also suggested that Wendy had a substance abuse problem.

Eric did admit that the children were close to Wendy, that they loved her, that she loved them, and that Wendy was their primary caretaker while he was at work. However, he indicated that he was close to the children as well, was involved in their education, discipline, and bedtime routines, and that he took them hunting and fishing. He expressed that it was important for his children to stay in Rapides Parish where they had always lived and attended church. He testified that he was willing to facilitate a close and continuing relationship between Wendy and the children. Eric also indicated that if he were awarded with domiciliary custody, he had a strong support system to assist him with getting the children to school. Ms. Lagrange and Mr. Quattlebaum also testified that they were willing to assist Eric with getting the children to and from school and watching them during the day as needed.

On the other hand, Wendy presented testimony and evidence that she had a very close relationship with her children and had always been their primary caretaker. She denied the substance abuse allegations. She further indicated that her children were picky-eaters, that she would cook two to three times per week, and that it was not financially feasible for her to cook a large meal every night. With respect to cleaning, she indicated she was doing the best she could do with three young children. She also suggested that it was Eric who had a substance abuse problem, that Eric would curse at her, and that Eric inappropriately used or left firearms in the presence of the children, all of which Eric denied. Wendy also indicated that Eric had sexually abused her on one occasion, which Eric denied as well.

Wendy admitted that Eric did assist her with the children and testified that in the past two and one-half months since she had been served with the petition for

3

divorce, Eric had "really stepped up to the plate and started being the daddy that I'm, I'm proud that he can be." She also indicated that her future plans as to where she was going to live or work were uncertain. She testified that there was a temporary job at a restaurant available to her but that she had not yet begun working.

Ms. Lagrange testified that, prior to Eric filing the petition for divorce, Wendy would drop the children off at her house between two and four times per week, and that sometimes Wendy stayed, but usually she did not. She indicated that when Wendy did stay, she would often take a nap. She stated, "Wendy don't want to grow up. She wants to leave and let you take care of her children. She would send them next door to my niece's and not go check on them" and that "she's not doing right." Ms. Lagrange indicated that this was hard for to her say because she loved Wendy. Wendy indicated that Ms. Lagrange was always willing to keep the children and never suggested that there was a problem with her doing so.

Eric's counsel argued at trial that Eric should be the domiciliary parent and suggested that Eric's father, Mr. Quattlebaum, would go to Eric's house at 5:00 a.m. when Eric leaves for work, so that the children could sleep later. Mr. Quattlebaum would then get the children dressed, bring Gus to school, and bring the other children to Ms. Lagrange's home where he would assist her in watching them.

The trial court made the following comments:

> Well, I understand that she doesn't have a lot of means. Well, there's good and bad on both sides. And, of course, the problem is I don't know the children. And the problem also is, that the children are very young. . . .

4

I just have a problem. [Wendy] does not have a house or any funds, right now, to get started. . . .

. . . .

Okay. Well, the advantage to Eric would be that he has a family here. But with, with him, you got a school where the kids go, that is a pretty good school. You got their church. You have family support. I loved your aunt, by the way. She's elderly. She's in a wheelchair, but she's a pistol. The family does not live far.

And the problem with the mother is, well if she moved there, she would use the same school and the same church, but she doesn't have the family support. I would assume that Eric's family would help her, though, because—not because they want to help Wendy, but they would want to help the children. I don't think that they're going to abandon the children because of what's happened with Wendy.

My problem is I think that [Mr. Quattlebaum] and [Ms. Lagrange] are old, and I don't know how long they can put up with three young children like that. [Eric] work[s] hard. [Eric] work[s] long hours.

. . . .

Well, I would-I would rather they not go to daycare. So, now that I think about that, it would be better that they be with [Mr. Quattlebaum] and [Ms. Lagrange].

Ultimately, the trial court granted a divorce based on the adultery of Wendy and denied Wendy's allegations of sexual abuse. In addition, the trial court entered an interim custody order, awarding the parties with joint legal custody, with Eric being named as the domiciliary parent. Wendy was given physical custody of the children every other weekend during the school year, alternating holidays, the entire month of June with Eric having alternating weekends during that time, and the month of August up until a week before the first day of school. The trial court also provided that Wendy was to have use of Eric's SUV when she had the children and allowed her to use Eric's truck when she did not.

In so ruling, the trial court stated the following:

5

I just—I need to try to find a way for her to have the children more.

. . . .

And see the problem is, I don't know where she lives or [is] going to live. I don't know if she['s] going to live in Pineville, Tioga, or she's going to live out there.

. . . .

[Wendy], what we're going to do is this, okay: What we're going to do is to come back in three months, . . . and in the meantime, I want yourself to get established, all right. Try to find a place to live, get to work, okay. Try to establish a household, all right. And you can do that, because I know you're not stupid. You can do all those things. And then we're going to come back, because these two younger children are not in school, okay. What, what I like is for children to have a routine. . . .

. . . .

But I would—because those children are still young, I want you to have as much time with those babies, because they need you, and you need them, okay. . . .

But, right now, the thing that bothers me is you, you don't, you don't have roots anywhere right now, okay. . . . I know you ha[ve]n't had the money. . . .

The trial court then re-fixed the matter to February 25, 2015, for review. At the review hearing, Eric testified that he had been the primary caregiver of the children since the court's prior ruling. He indicated that he worked Monday through Thursday, that he left for work between 4:30 a.m. and 5:00 a.m., and that he worked until 4:30 p.m. He testified that Mr. Quattlebaum would either spend the night at his home or come over in the morning before he left for work, and that Mr. Quattlebaum would then wake and dress the children, feed them breakfast, bring the younger children to Ms. Lagrange's home around 7:45 a.m., and then bring Gus to school by 8:30 a.m. Eric also testified that he would cook for the family regularly, and that they would all sit down to eat together.

6

Eric admitted that the children missed their mother, and he indicated that they would talk to her on the phone almost every night. He further admitted that Wendy was doing "what she's supposed to be doing" since the last hearing. He indicated that he gave Wendy additional time with the children and that he has a good relationship with Wendy's parents.

There was also testimony reflecting that Gus was doing well in his pre-kindergarten program, but that the parties' separation and circumstances were affecting him emotionally. Eric presented testimony and evidence suggesting that Wendy was overbearing and making the situation more difficult for Gus by unnecessarily talking with him about the circumstances between the parties, asking unnecessary details about what the children did while with Eric or his family, and praying with the children that they would go live with her after the review hearing. Eric also suggested that Wendy would take Presley out of her Sunday school class on his weekends and bring her to the class in which she was assisting. He also indicated that since the first hearing, Wendy had had two auto accidents, one of which involved Eric's truck.

Wendy testified that since the first hearing, she had held a temporary job working at Petron and Crispy Crunchy Chicken, and that she currently worked as a service clerk at a Toyota dealership. She worked Monday through Friday from 7:00 a.m. until 5:00 p.m. She further testified that she had rented and was living in a mobile home where the older children share a room, and Presley slept with her. Her home was approximately twenty to twenty-five minutes away from Eric's home, and was next door to a daycare center, and she presented pictures of the home. She indicated that her home was in a different school district than Eric's home.

Wendy also presented evidence and testimony in an effort to suggest that Eric was not properly bathing the children or providing necessary clothing for them when sending them to her home, and that Eric was not keeping her informed of school activities, all of which Eric denied. Wendy further denied Eric's accusations. She did admit, however, that the children missed their dad whenever they were staying with her. She also admitted to having a continued relationship with the man with whom she had had an affair, but indicated that the children had never met him.

The trial court made the following comments prior to ruling:

> [In] October of last year, she wasn't doing what she was supposed to do. . . . This is just February. So we're talking about . . . four months and I would be a little concerned about a four month period of time. It's nice that she has all these pictures and her house is clean.
>
> . . . .
>
> But her house wasn't clean last time. I mean that's—that's not a good environment for the children to be in and I understand that she saw these pictures last time. So she took some real good pictures this time. I'm not saying her house is not like that, I'm just saying I question in four months if she's made that big of a change. I have no way of knowing.

In addition, the trial court stated that it agreed with Eric's counsel

> that the children are hurting . . . mainly because of [Wendy's] own actions and inactions and she whips them into a frenzy about whether or not they miss her, whether or not they like her, whether or not they love her, you know, does she like their daddy, love their daddy. She is the one who is whipping them up into a frenzy when she goes and sees them at church. When she goes and takes one of the children who is holding his daddy's hand away from him[.]

The trial court further stated:

> Well, I don't think anything has really changed with Eric. I was satisfied last time about him getting the children and I've not heard anything this time that would concern me about him having the children. The only thing that concerns me is whether or not [Wendy]

should have more time and whether or not that would be in their best interest . . . .

. . . .

I have nothing to make me change what's going on with Eric. As I said, he was—I ruled that way October the 31st because I thought he . . . was the most stable one to take care of the children. [Wendy] was not stable at that time and as the aunt said[,] she needs to grow up. I mean I think that she's trying to do that now. She's got a job, she's working full time, she's got a nice place.

Ultimately, the trial court rendered a final custody judgment that awarded Wendy with additional time with the children so that she had them on the first, second, and fourth weekends of the month in addition to any school holidays that would extend these weekends by a day, and the entire months of June and July with Eric to have alternating weekends and one full week during that time period. All other terms of the interim judgment were incorporated into the final judgment.

Wendy now appeals, asking us to reverse the trial court's judgment and "render a decision on the record." She states the following as assignments of error:

1. The Trial Judge erred in awarding custody to the father when his ruling really made a de facto ruling of custody to the father's relations.

2. The Trial Judge erred in not modifying the temporary interim ruling when the mother modified her situation as requested by the Trial Judge.

3. The Trial Judge erred by allowing extrajudicial evidence when he talked off the record to a paternal aunt asking her opinion about the changes made or not made by the Appellant.

## STANDARD OF REVIEW:

The standard of review in child custody matters has been stated by this court as follows: "[A] trial court's determination in a child custody case is entitled to great weight on appeal and will not be disturbed unless there is a clear abuse of

9

discretion." *Hawthorne v. Hawthorne*, 96-89, p. 12 (La.App 3 Cir. 5/22/96), 676 So.2d 619, 625, *writ denied*, 96-1650 (La. 10/25/96), 681 So.2d 365.

In a child custody proceeding, the trial court must consider all factors relevant to the child's best interest. La.Civ.Code art. 134. Further,

> [t]he court is not bound to make a mechanical evaluation of all of the statutory factors listed in La. C.C. art. 134, but should decide each case on its own facts in light of those factors. The court is not bound to give more weight to one factor over another, and when determining the best interest of the child, the factors must be weighed and balanced in view of the evidence presented. Moreover, the factors are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court.

*Thibodeaux v. O'Quain*, 09-1266, p. 5 (La.App. 3 Cir. 3/24/10), 33 So.3d 1008, 1013 (quoting *Cooper v. Cooper*, 43,244 (La.App. 2 Cir. 3/12/08), 978 So.2d 1156).

## ASSIGNMENT OF ERROR NO. 1

In her first assignment of error, Wendy argues that the trial court committed legal error by awarding "de facto" custody to Ms. Lagrange and Mr. Quattlebaum without proof that granting custody to either parent would be detrimental to the children or that awarding custody to a non-parent was in the best interest of the children. Wendy suggests that, because of Eric's work schedule, it is actually Ms. Lagrange and Mr. Quattlebaum who are caring for, or have custody of, the children.

However, the trial court's order does not mandate that Ms. Lagrange or Ms. Quattlebaum care for the children, does not give Ms. Lagrange or Mr. Quattlebaum any rights with respect to the children, and does not otherwise mention Ms. Lagrange or Mr. Quattlebaum. Neither Ms. Lagrange nor Mr. Quattlebaum were

10

awarded with actual, or "de facto," physical or legal custody of the children.[1] Instead, Eric and Wendy were awarded with joint legal custody of the children, with Eric named as the domiciliary parent and with physical custody to be shared by the parties in accordance with the schedule set forth in the trial court's judgment.

As the domiciliary parent, Eric has the "authority to make all decisions affecting the child[ren] unless an implementation order provides otherwise[,]" which it did not in this case. La.R.S. 9:335(B)(3). Therefore, he is acting within his authority in leaving the children in the care of his father and aunt. *See Lebo v. Lebo*, 04-444 (La.App. 1 Cir. 6/25/04), 886 So.2d 491. Moreover, there is no indication that Wendy even challenged Eric's decision to leave the children in the care of Mr. Quattlebaum or Ms. Lagrange while both Eric and Wendy were at work, or otherwise suggested that this arrangement was not in the children's best interest.[2] In fact, she testified that even if she were designated with domiciliary status, she would be willing to continue leaving the children with Ms. Lagrange and/or Mr. Quattlebaum during the day rather than send them to daycare. Moreover, even before the parties separated, Wendy would routinely leave the

---

[1] The supreme court stated in *Evans v. Lungrin*, 97-541, 97-577, pp. 10-11 (La. 2/6/98), 708 So.2d 731, 737 (citations omitted), *writ denied*, 00-683 (La. 3/15/00), 755 So.2d 890, that:

> [t]he term "custody" is usually broken down into two components: *physical* or "actual" *custody* and *legal custody*. The typical joint custody plan will allocate time periods for *physical custody* between parents so as to promote a sharing of the care and custody of the child in such a way as to ensure the child of frequent and continuing contact with both parents. *Legal custody*, by contrast, has previously been defined as "the right or authority of a parent or parents, to make decisions concerning the child's upbringing."

[2] Major decisions made by the domiciliary parent concerning a child are presumed to be in the child's best interest, and therefore the non-domiciliary parent has burden of proving any such decisions are not in the child's best interest. *Evans v. Lungrin*, 708 So.2d 731.

11

children with Ms. Lagrange. Therefore, we find this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 2

In her second assignment of error, Wendy argues that the trial court was required, but failed, to "modify" custody because she had complied the trial court's directives for her to find a job, find a place to live, and establish a household that the trial court provided at the conclusion of the first hearing. However, the following colloquy took place between Wendy and the trial court wherein the trial court make clear that it was not guaranteeing that any change in the interim custody arrangement would occur at the review hearing:

BY [WENDY]:

> Do—If I, if I get a job, if I become established, is there any way . . . I could be the domiciliary parent? Is there any way?
>
> . . . .

BY THE COURT:

> What we're going to do is come back in three months and discuss that. Okay?

BY [WENDY]:

> Give me your word.

BY THE COURT:

> I'm, I'm telling you we will do whatever we can do to establish, to continue that relationship. But I can't tell you what I'm going to do, okay.

BY [WENDY]:

> Yes, yes, sir.

BY THE COURT:

12

Because I don't know. But I am suggesting to you, for you and your children, to go and do those things that you need to do, okay.

Moreover, the trial court did in fact "modify" the interim order by giving Wendy additional physical custody of the children including an additional weekend each month during the school year, as well as the entire month of July. It is unclear from Wendy's brief to this court as to how she believes the trial court should have modified the interim custody judgment after the review hearing; however, we fail to see how the record before us shows that the trial court's final custody judgment was an abuse of discretion. Therefore, this assignment of error lacks merit.

## **ASSIGNMENT OF ERROR NO. 3**

In her final assignment of error, Wendy takes issue with an apparent off-record colloquy between the trial court and Ms. Lagrange during the review hearing that did not appear in the hearing transcript. Wendy asserts that "[i]t is believed that the comments made by Ms. Lagrange, off the record, were biased and did have an influence on the Judge's ruling[.]" This testimony was apparently in addition to Ms. Lagrange's testimony that is in the record. It appears undisputed that the off-record discussion at issue took place in the presence of counsel for both parties, however, unbeknownst to counsel or the court at the time, the court reporter did not record the testimony.

Louisiana Code of Civil Procedure Article 2131 states:

If the testimony of the witnesses has not been taken down in writing the appellant must request the other parties to join with him in a written and signed narrative of the facts, and in cases of disagreement as to this narrative or of refusal to join in it, at any time prior to the lodging of the record in the appellate court, the judge shall make a written narrative of the facts, which shall be conclusive.

13

However, there is no indication Wendy attempted to have the omitted testimony of Ms. Lagrange included in the manner provided by La.Code Civ.P. art. 2131, much less any indication that Wendy attempted to have any material part of the record that was omitted corrected on appeal. See La.Code Civ.P. art. 2132. Therefore, the content of the omitted testimony is not before us for review.

Moreover, as previously stated, the testimony and evidence presented in the record that is before us supports the trial court's final award of custody, regardless of any omitted testimony of Ms. Lagrange, and the trial court's decision is not an abuse of discretion or otherwise not in the best interest of the children. Therefore, this assignment of error also lacks merit.

### CONCLUSION

For the reasons set forth above, the trial court's final custody judgment is affirmed. Costs of this appeal are assessed to appellant, Wendy Noel Glenn Quattlebaum.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules—Courts of Appeal. Rule 2–16.3.