621 So.2d 36 (1993)
Ralph Lee YELVERTON, Plaintiff-Appellant,
v.
Candace Cotton YELVERTON, Defendant-Appellee.
No. 24913-CA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 1993.
*37 J. Spencer Hays, Bossier City, for plaintiff-appellant.
Booth, Lockard, Politz, LeSage & D'Anna by Nyle A. Politz, Shreveport, for defendant-appellee.
Before NORRIS, HIGHTOWER and STEWART, JJ.
NORRIS, Judge.
Ralph Yelverton appeals a detailed judgment that awards sole custody of his two-year old daughter, Megan, to her mother, Candace McWaters. The judgment resembles a joint custody plan in its provisions for sharing time and information, but it gives Candace exclusive decisionmaking power. For the reasons expressed, we affirm.

Factual background
Ralph and Candace married in June 1987; each had been previously married and had a daughter from the prior marriage. Ralph is nine years older than Candace and works as an independent painting contractor. Candace has held a number of jobs, such as waitress and hairdresser. Their marriage did not go smoothly; Candace felt Ralph was domineering and frequently left him for short periods of time. During one of their reconciliations in late 1989, Candace became pregnant with Megan, but she did not tell Ralph about this until late January 1990, when she finally left him for good.
In a manner indicative of the communication problems that followed, the parties hotly disputed exactly how Candace disclosed her pregnancy to Ralph. According to Candace, she told him she wished he was not the child's father; however, Ralph claims she told him he was not the father. Candace explained that she did not meet her current husband, Mike McWaters, until *38 after she left Ralph. Because of Ralph's questions about paternity, all petitions and judgments through January 1991, when a DNA test proved that Ralph was indeed the father, refer to custody and child support in only a conditional manner.
Ralph filed for separation in February 1990; it was granted in March. Megan was born in July 1990. Candace filed for divorce in October 1990, alleging she had custody of the child and was entitled to an ex parte order of provisional custody, subject to Ralph's reasonable visitation rights. The court minutes of November 15, 1990 state, "Case is called and tried. By agreement, there is judgment in favor of the plaintiff as prayed for." The judgment, however, recites, "evidence adduced by testimony and stipulation of the parties hereto"; it grants "interim judgment herein" awarding Candace custody of Megan subject to reasonable visitation privileges. R. pp. 6, 49 (emphasis added both places). There is no transcript of the November 15 hearing, and from the conflicting documentary evidence we cannot find that the interim judgment is a considered decree. At this point, however, Ralph's paternity was not yet established; DNA tests in January 1991 settled the question.
In September 1991 Ralph filed the instant rule to modify custody, urging a substantial change of circumstances in that Megan was now 14 months old and better able to spend time away from her principal residence; and that at the time of the prior judgment, paternity was still at issue but it has since been resolved. He prayed for joint custody in which Megan would primarily live with her mother, but Ralph would keep her every Tuesday night and all day Wednesday, every Thursday night and all day Friday, alternating weekends (from Friday night until Monday morning), alternating holidays, all of Megan's birthdays, six full weeks in the summer, two full weeks not during the summer, and "reasonable" times when out-of-town relatives visit.
Ralph's rule did not come up immediately; without receiving evidence, the court entered an interim order on November 21, 1991, continuing Candace in sole custody, and granting Ralph visits on alternating weekends and "any additional visitation as may be agreed upon by and between the parties."
The rule was heard in July 1992. All witnesses admitted that both Ralph and Candace loved Megan very much and were fit parents (although Candace and her mother took issue with some of Ralph's disciplinary practices). The parties also agreed that the specifically set weekend visits had worked extremely well; Ralph was efficient and punctual about picking up Megan for, and returning her from, these visits. The trouble, it turns out, was arranging the "additional" visits, which always seemed to spark disagreements and arguments.
According to Candace, Ralph really wanted to keep Megan three days every week; typically he would phone her on Monday, right after a weekend visit, and try to schedule a mid-week visit when it was "just not convenient." He was often persistent, calling her several times in the week. She denied his requests on occasion because Mike (her current husband) had a softball game, or because they were having dinner with friends; once she denied a visit because Megan had chicken pox. Candace testified that Megan was disoriented and "clingy" when she returned from frequent visits. Candace also testified that whenever she would deny a visit, Ralph would become argumentative. Once when Candace had called off a visit, Ralph came to her house and actually grabbed Mike by his bathrobe. On the occasion when Megan had chicken pox, Ralph phoned the pediatrician's office and got a nurse to say it was okay for the child to go to Ralph's house.
Ralph kept a calendar of his visits with Megan from January 1992 up through trial. This showed that over the seven-month period, he had five mid-week visits. Most of these were in April and May, when he was threatening to set the rule for hearing. In June, after the rule was set, Candace allegedly told him not to call back, as he would be getting his scheduled weekend visits and nothing more. Ralph testified he was only *39 trying to enforce his understanding of the interim order, so he took a dim view of most of Candace's excuses for denying visits. When she denied his requests, he would threaten her with contempt of court. He admitted that he and Candace could not communicate. R. p. 204. In response to a question from the bench, Ralph testified he wanted joint custody in order "to have the legal right to make decisions concerning Megan's life, to be able to take her to a * * * church of my choice[.]"

Action of the trial court
Ruling from the bench, the district court found that Ralph was primarily the one who was trying to get his own way with visitation, although Candace was intent on thwarting him. The court acknowledged the presumption of joint custody in Civil Code article 131, but found it was not appropriate here because art. 131 C(2)(j) requires both parents to be willing and able to facilitate and encourage a close and continuing relationship between the child and the other parent; and because Turner v. Turner, 455 So.2d 1374 (La.1984), requires the parties to cooperate in any joint custody plan. Citing Ralph's responses to questions from the bench, the court found it "clearly demonstrated" that the parties could not communicate. The court therefore removed any requirement that they communicate and participate in joint decisions about Megan. However, in granting Candace sole custody, it awarded Ralph extensive visitation, similar to the custodial time often awarded to the nondomiciliary parent in joint custody cases. Ralph was to have Megan (1) on alternating weekends (just as in the interim order), (2) on Wednesday afternoons from 5:00 to 7:30 p.m. (to rectify the main source of the disputes), (3) specified portions of the summer, gradually increasing to half the summer when Megan turns five, and (4) alternating holidays.
Ralph now appeals, urging the district court erred in awarding sole custody of Megan to Candace, and in failing to consider all the factors of art. 131 in fashioning the custody decree.

Discussion
Louisiana law establishes a presumption in favor of joint custody of children of the marriage. La.C.C. art. 131 C; Guillory v. Guillory, 602 So.2d 769 (La. App. 3d Cir.1992). The presumption, however, may be rebutted by a showing that it is not in the child's best interest, after considering evidence with respect to several factors listed in the statute.[1] Even in light of the statute, courts have repeatedly held that the parents' ability to cooperate on matters affecting the child's welfare is of paramount importance; proof of an inability to communicate or work together may therefore defeat joint custody. Turner v. Turner, supra; Murray v. Murray, 521 So.2d 754 (La.App.2d Cir.1988); Benson v. Benson, 597 So.2d 601 (La.App. 5th Cir.), writ denied 600 So.2d 627 (1992). The trial court's findings in child custody matters *40 are entitled to great weight and will not be disturbed on review without a showing of clear abuse. Bergeron v. Bergeron, 492 So.2d 1193 (La.1986).
Ralph first argues that he should not be held to the "heavy burden" to change custody because the interim judgment of November 1990 and the interim order of November 1991 were not "considered decrees." See Bergeron v. Bergeron, supra; Dungan v. Dungan, 499 So.2d 149 (La.App.2d Cir.1986). This argument is correct; from the judgments and minute entries in this record it does not appear that evidence as to parental fitness for custody was ever received by the court until the instant hearing. See Norris v. Norris, 604 So.2d 107 (La.App.2d Cir.1992). In the absence of a prior considered decree, the party seeking to change custody need prove only the best interest of the child. Norris v. Norris, supra; Key v. Key, 519 So.2d 319 (La.App.2d Cir.1988). Our review of the record convinces us that the district court did not hold Ralph to the heavy burden, but required him to prove only Megan's best interest. Admittedly, Ralph showed some change of circumstances with the results of the DNA test.
By his first assignment Ralph urges the district court erred in considering only one factor, the parties' inability to communicate, instead of all the statutory factors, in fixing custody. The applicable article mandates that the trial court analyze all the factors. La.C.C. art. 131 C(2); Cooper v. Cooper, 579 So.2d 1159 (La.App.2d Cir. 1991). The testimony at the instant hearing was long and wide-ranging; it revealed no genuine dispute as to most of the statutory factors. For example, it is clear that both parties love Megan and can provide her a good home life, both materially and emotionally; they live close enough that visits or exchanges of custody can be easily effected. Although the court did not cite all the factors, it obviously and reasonably found them equally favorable to both parties.
The court therefore focused on the critical factor, the parties' inability to cooperate in setting additional, unspecified visits. Ralph argues that this rewards Candace for being difficult and thwarting his efforts to schedule the visits to which he was entitled. We disagree; the court noted that Candace was not free of fault, but found Ralph primarily responsible for the failure to agree. Even from the impassive record we can see evidence to support this conclusion. Ralph testified he understood his "additional" mid-week visits to mean every week, and that if Candace did not comply with his understanding, he would try to place her in contempt of court. He expressed strong opinions about the type of movies that young children can be allowed to watch, and refused to budge when Candace differed with him. At trial he "loud talked" and tried to shout down Candace's lawyer. In response to questions from the bench, he stated that joint custody would permit him to make the decisions about Megan's life and church. Admittedly, Candace's testimony about her excuses for denying his requests for visits is, at times, less than convincing, but under the circumstances we cannot say the court was plainly wrong in finding Ralph primarily responsible for the communication breakdown and in elevating this to the determinative factor in the case.
By his second assignment Ralph urges the court erred in awarding sole instead of joint custody. He elaborates that on the record presented, a joint custody plan with clearly delineated periods for the noncustodial parent would be preferable to the sole custody actually awarded. We must observe, however, that this sole custody decree does in fact delineate mid-week visits and grants Ralph visitation time equal to (or greater than) the custodial time granted in many joint custody decrees. See, e.g., Carroway v. Carroway, 475 So.2d 48 (La.App.2d Cir.1985); Waits v. Waits, 556 So.2d 215 (La.App.2d Cir.1990). We do not find the district court abused its discretion in allocating Megan's time with Ralph.
The judgment also removes certain decisionmaking power from Ralph. In light of his proven inability to communicate *41 and cooperate with Candace in basic decisions affecting Megan's life, we do not find the court abused its discretion. Admittedly, Ralph has not displayed the level of litigiousness that so influenced the court in Turner v. Turner, supra. However, given Ralph's frequent threats to file contempt rules, the district court was entitled to remove the source of future disputes by giving Candace the decisionmaking power. This derogation from Ralph's parental authority is well tailored to the evidence presented and to Megan's best interest. We find no abuse of discretion.
For the reasons expressed, the judgment is affirmed. Costs are assessed to appellant, Ralph Yelverton.
AFFIRMED.
NOTES
[1] The factors, listed in La.C.C. art. 131 C(2), include:

(a) The love, affection, and other emotional ties existing between the parties involved and the child.
(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his religion or creed, if any.
(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care, and other material needs.
(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.
(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(f) The moral fitness of the parties involved.
(g) The mental and physical health of the parties involved.
(h) The home, school, and community record of the child.
(i) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(j) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent.
(k) The distance between the respective residences of the parties.
(l) Any other factor considered by the court to be relevant to a particular child custody dispute. However, the classification of persons according to race is neither relevant nor permissible.