858 So.2d 615 (2003)
Jan C. WALET
v.
Dr. John Justin CAULFIELD.
No. 2002 CU 2009.
Court of Appeal of Louisiana, First Circuit.
June 27, 2003.
*616 Michael S. Walsh, Baton Rouge, for Plaintiff-Appellee Jan C. Walet.
Bennett Wolff, Metairie, for Defendant-Appellant Dr. John J. Caulfield.
Before: CARTER, C.J., GUIDRY, PETTIGREW, McDONALD, and McCLENDON, JJ.
PETTIGREW, J.
This is an action for custody of a 6-year-old child. The acknowledged father now appeals from a judgment of the family court that awarded sole custody of the child to the natural mother with the father having visitation every other weekend during the school year. The father also appeals from the court's determination that *617 he post a $100,000.00 bond in accordance with R.S. 9:342 to insure his compliance with the family court's child custody order. We reverse in part, render, affirm in part, and remand with instructions.[1]

FACTS
The record reflects that Jan C. Walet (Ms. Walet) and Dr. John Justin Caulfield (Dr. Caulfield) met at the wedding of a friend in January 1995. Ms. Walet, who holds a master's degree in finance, later moved from her home in New Orleans, Louisiana, to Lancaster, South Carolina, in the fall of 1995[2], and began residing with Dr. Caulfield, a urologic surgeon. Through this relationship, Ms. Walet and Dr. Caulfield conceived a child. In the late spring of 1996[3], Ms. Walet returned to Louisiana. At this time, Ms. Walet was approximately five months pregnant. Ms. Walet subsequently gave birth to a son, Parker Hayes Caulfield Walet, at Woman's Hospital in Baton Rouge, Louisiana, on October 11, 1996. Dr. Caulfield, the acknowledged father, visited the child in the hospital following his birth, and voluntarily began paying child support at the rate of $1,200.00 per month.
Ms. Walet returned to South Carolina with the child during Thanksgiving and Christmas of 1996, and subsequently resumed living with Dr. Caulfield in South Carolina in February 1997. In May 1997, Ms. Walet left Dr. Caulfield a note and again returned to Louisiana, dividing her time between her mother's residence in Baton Rouge, and her father's residence in New Orleans. On June 3, 1997, Ms. Walet filed a Motion For Ex Parte Order of Provisional Custody in the Family Court of East Baton Rouge Parish together with a Motion to Establish Custody and Child Support. Service was apparently withheld on these motions, and at some point Dr. Caulfield proposed marriage to Ms. Walet. Ms. Walet initially accepted Dr. Caulfield's proposal, but later broke off their engagement.
On November 25, 1997, Ms. Walet refiled her previous motion for sole custody and child support. Dr. Caulfield was subsequently served with Ms. Walet's motion in Lancaster, South Carolina, on January 19, 1998. In January 1998, Ms. Walet obtained a job selling radio advertising for Centennial Broadcasting in New Orleans. Prior to this time, Ms. Walet supported herself and the child on money from her tax refund and support payments sent by Dr. Caulfield.
Thereafter, Dr. Caulfield retained an attorney in Louisiana and filed an answer together with a reconventional demand seeking joint custody. Dr. Caulfield also requested that the child's name be changed from Parker Hayes Caulfield Walet to Parker Hayes Walet Caulfield. During this time, Dr. Caulfield made repeated trips to Baton Rouge, Louisiana, from South Carolina, for the purpose of spending several hours of supervised visitation with his son.
On October 27, 1998, Dr. Caulfield filed a motion seeking a status conference to fix interim visitation on a regular and periodic basis. Following a hearing on November *618 10, 1998, the family court issued an interim judgment that granted Dr. Caulfield unsupervised visitation with the child on specific days from November 27, 1998, through April 3, 1999. Dr. Caulfield was further ordered to submit to random drug testing "in the manner he had been doing in South Carolina."[4] Dr. Caulfield testified however that he had never been ordered to submit to drug testing in South Carolina.
On December 15, 1998, the family court reduced to judgment an agreement made by the parties in March 1998, that Dr. Caulfield would pay child support in the amount of $1,200.00 per month. Later, on January 25, 1999, the family court amended its earlier interim judgment on visitation to include a provision that Dr. Caulfield's interim visitation be confined to East Baton Rouge Parish. Citing a decline, and the impending liquidation of his solo medical practice in South Carolina, coupled with Ms. Walet's demand that visitation be confined to East Baton Rouge Parish, Dr. Caulfield filed a motion to reduce child support.
In March 1999, Dr. Caulfield closed his practice in South Carolina and was hired by Tulane University Medical Center as an assistant professor of urology and director of its Northshore clinic. The custody matter scheduled for April 7, 1999, was continued and reset for June 18, 1999. Following Dr. Caulfield's move to Louisiana, the relationship between the parties became much more acrimonious.
On June 18, 1999, the parties entered into a consent decree wherein the issue of custody was pretermitted without prejudice to either party. Dr. Caulfield was once again awarded specific periods of visitation with the child every other weekend, commencing June 20, 1999, and extending through October 24, 1999. Since Dr. Caulfield's income had decreased, his child support obligation was reduced to $1,100.00 per month. At this point, Dr. Caulfield was living across Lake Pontchartrain, in Mandeville, Louisiana, and Ms. Walet was residing in New Orleans.
Ms. Walet testified that upon encouragement from her former boss in New Orleans, she obtained a better paying job as an account executive for Guaranty Broadcasting in Baton Rouge. Dr. Caulfield responded by filing a rule for reduction in child support,[5] on December 14, 1999.
During the summer of 2000, Ms. Walet apparently refused to allow visitation between the child and his father on the grounds that the earlier visitation schedule had expired. By January 2001, the parties, *619 with limited success, had agreed on their own to exchange the child every other weekend. Dr. Caulfield asserted that because Ms. Walet had denied him the opportunity to make up a weekend of visitation missed in early January when the child was sick, he kept the child an additional two days on his next weekend visitation. Ms. Walet sought and obtained an emergency order from the family court on January 30, 2001, directing Dr. Caulfield to return the child to Ms. Walet.
Contending that there had been no judicial order or agreement between the parties regarding visitation, Dr. Caulfield sought an emergency writ from this court seeking to have the January 30, 2001 order vacated.[6] Dr. Caulfield argued that absent a determination on custody, the parents were co-tutors of the child sharing equal authority, privileges, and responsibilities. Said application was denied on the ground that the January 30, 2001 order did not make a determination as to legal custody. This court did however remand this matter to the family court for an immediate entry of an interim visitation schedule. Following a hearing on April 3, 2001, a judgment was rendered on April 4, 2001, regarding interim visitationthe family court awarded Dr. Caulfield a weekend of visitation pending a subsequent emergency hearing on April 17, 2001.[7] In addition, Dr. Caulfield was directed to provide Ms. Walet with an affidavit setting forth his phone number and address.
After almost two years, Dr. Caulfield left Tulane in the spring of 2001, and elected to return to the private practice of urology. Dr. Caulfield became affiliated with a urologist in Covington that spring, but the two physicians agreed to a mutual split several months later.
Dr. Caulfield testified that although there was no custody order in place, he and Ms. Walet purportedly had a verbal discussion wherein they tried to work out a visitation schedule for the summer of 2001. It was Dr. Caulfield's understanding that he would receive two weeks of visitation with the child during summer, specifically, the first week of July and the first week of August. Dr. Caulfield testified that he was later informed that Ms. Walet had elected to have custody of the child during the first week of July, and that he would have visitation on an alternate week.
By August, Dr. Caulfield had not been granted the two weeks of visitation that had purportedly been agreed upon. Believing that Ms. Walet was attempting to deny him visitation with the child, Dr. Caulfield advised Ms. Walet at the conclusion of a weekend visitation that since there was no written agreement, he planned to keep the child for the time he was supposed to have during the summer[8]. Ms. Walet responded by filing a Rule for Immediate Emergency Custody on August 21, 2001. The family court in Baton Rouge signed an order directing the sheriff of St. Tammany Parish to pick up the child from Dr. Caulfield and deliver him to Ms. Walet.
Nevertheless, on September 4, 2001, the family court rendered a judgment awarding temporary custody of the child to the *620 parties jointly. Said judgment further designated Ms. Walet as the primary domiciliary parent and awarded Dr. Caulfield visitation on alternating weekends.
In an apparent attempt to be more involved in his son's life, Dr. Caulfield moved his practice again to Baton Rouge in November 2001. Ms. Walet admitted that Thanksgiving is a more important holiday for Dr. Caulfield's family than for hers, and further that Dr. Caulfield normally takes the child to visit his parents in Birmingham. Ms. Walet claimed that she would have "gladly given" the child to Dr. Caulfield for Thanksgiving "except for what had happened in August." Ms. Walet stated that without a "written, stamped order" she was not going to allow visitation outside of every other weekend.
Ms. Walet gave a deposition in her lawyer's office on December 5, 2001; however, during the entire month of December, Ms. Walet failed to appear with the child for visitation and refused to answer Dr. Caulfield's repeated calls. Thus, there was no Christmas visitation between the child and his father. This scenario was repeated during Dr. Caulfield's first scheduled visitation in January 2002. Ms. Walet initially claimed that she did not have an address for Dr. Caulfield; however, Ms. Walet later conceded that although she had an address for Dr. Caulfield, she was uncertain as to whether this was a permanent address. Ms. Walet flatly admitted that she never telephoned Dr. Caulfield, did not respond to Dr. Caulfield's repeated telephone calls, and did not allow visitation until there was testimony in court on January 22, 2002, concerning Dr. Caulfield's address.
Dr. Caulfield testified that he did not have visitation with the child during the last two weeks of December 2001, and Ms. Walet took the child to Tennessee for Christmas. Claiming that he did not know what was going on, Dr. Caulfield admitted that he visited the Country Day School between Christmas and New Year's and was informed that the child was not there. Dr. Caulfield stated that he went to the school again on January 2, 2002, in an attempt to find out about his child.
Ms. Walet testified that upon returning the child to Country Day School on Wednesday, January 2, 2002, she received a telephone call from the school's director requesting that she come to the school. Upon arriving at the school, Ms. Walet stated she found Dr. Caulfield in the child's classroom. The director purportedly asked Dr. Caulfield to step outside and speak with them. Ms. Walet claimed that she "basically didn't say much" and allowed the director to handle the matter. The director purportedly telephoned the school's owner after Dr. Caulfield left, and the owner advised Ms. Walet that the child would not be allowed back at the school. Despite the fact that the child had attended the school for two years, Ms. Walet claimed that school officials were nervous about Dr. Caulfield's repeated calls and appearances at the school, some of which were unexpected. The child was subsequently enrolled at University Baptist Child Care Development Center on Monday, January 7, 2002.
At a hearing before the family court on January 22, 2002, Dr. Caulfield's rule for contempt due to his missed visitation at Christmas was pretermitted, and Dr. Caulfield stated for the record his physical address and telephone number. Pending a trial on the merits, the court ordered the parties to exchange the child every other weekend.

ACTION OF THE TRIAL COURT
This matter was tried in the Family Court of East Baton Rouge Parish on March 4 and 6, 2002. Dr. Caulfield testified *621 that his office address is Physician's Plaza, No. 2, Suite 311, Summit Hospital, 17050 Medical Center Drive, Baton Rouge, Louisiana. Dr. Caulfield testified that since November 2001, he has shared a residence located at 3123 Myrtle Grove Drive, Baton Rouge, Louisiana, with the owner, Jeffrey Schneider, a 27 or 28-year-old LSU graduate student from Atlanta, Georgia, whom Dr. Caulfield met in October 2001.
At the conclusion of the hearing, the family court awarded permanent sole custody of the child to Ms. Walet with alternating weekend visitation to Dr. Caulfield. Dr. Caulfield was also awarded three weeks of visitation during the summer and alternating holidays. Concluding that Dr. Caulfield presented a risk of abducting the child during visitation, the family court required that Dr. Caulfield post a $100,000.00 bond in accordance with La. R.S. 9:342 to secure his compliance with child custody and visitation. Dr. Caulfield was further found in contempt of court for three separate incidents of child support arrearages, and pursuant to La. R.S. 9:375 was assessed $850.00 in attorney fees for each infraction.
Dr. Caulfield applied to this court for writs on April 26, 2002, and requested that the family court stay its bond requirement during the pendency of his writ application. Dr. Caulfield also perfected an appeal from the family court's judgment of April 1, 2002. The family court denied Dr. Caulfield's request for a temporary stay of its $100,000.00 bond requirement. On June 11, 2002, this court denied Dr. Caulfield's writ application and held that the ruling complained of was a final, appealable judgment that could be reviewed on appeal when the entire record is before the court.[9] Dr. Caulfield also filed a writ application with the supreme court that was denied on July 1, 2002.[10]

ISSUES PRESENTED FOR REVIEW
In connection with his appeal in this matter, Dr. Caulfield sets forth the following issues for review by this court.
1. Did Ms. Walet prove by clear and convincing evidence that sole custody is in the best interest of [the minor child]?
2. Is it in [the minor child's] best interest to have more frequent contact than every other weekend with his father during the school year?
3. Was the testimony and documentation regarding the consent order between Dr. Caulfield and DHEC inadmissible because it was hearsay, irrelevant, and contrary to C.E. Arts. 902-905?
4. Is Dr. Caulfield a flight risk warranting the imposition of a R.S. 9:342 bond?

STANDARD OF REVIEW
It is a well recognized tenet of Louisiana jurisprudence that an award of child custody is not a tool to regulate human behavior. Cleeton v. Cleeton, 383 So.2d 1231, 1236 (La. 1979)(on rehearing). Every child custody case must be viewed within its own peculiar set of facts. Connelly v. Connelly, 94-0527, p. 4 (La.App. 1 Cir. 10/7/94), 644 So.2d 789, 793. The trial judge is in the best position to ascertain the best interest of the child given each unique set of circumstances. Accordingly, a trial court's determination of custody is entitled to great weight and will not be reversed on appeal unless an abuse of discretion is clearly shown. Thompson v. Thompson, 532 So.2d 101, 101 (La. 1988)(per curiam); Bercegeay v. Bercegeay, 96-0516, p. 5 (La.App. 1 Cir. 2/14/97), 689 So.2d 674, 676.
*622 In the instant case, as in most custody cases, the trial court's determination was based heavily on factual findings. As an appellate court, we cannot set aside the trial court's factual findings unless we determine that there is no reasonable factual basis for the findings and the findings are clearly wrong (manifestly erroneous). Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Furthermore, when factual findings are based on the credibility of witnesses, the fact finder's decision to credit a witness's testimony must be given "great deference" by the appellate court. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Thus, when there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, although the appellate court may feel its own evaluations and inferences are as reasonable. Id. Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required to redetermine the facts de novo from the entire record and render a judgment on the merits. Id.

DISCUSSION
The first issue raised by Dr. Caulfield questions whether Ms. Walet established by clear and convincing evidence that sole custody is in the best interest of the minor child.
Evidence that Sole Custody was in the Best Interest of the Child
In its judgment, the family court relied upon Hawthorne v. Hawthorne, 96-89 (La.
App. 3 Cir. 5/22/96), 676 So.2d 619, writ denied, 96-1650 (La.10/25/96), 681 So.2d 365, and Yelverton v. Yelverton, 621 So.2d 36 (La.App. 2 Cir.1993), presumably, for the proposition that under prior jurisprudence, where the parties' testimony revealed that sufficient animosity and rancor existed between them such that they could not work together to the extent required in a joint custody arrangement, the courts awarded sole custody. See Hawthorne, 96-89 at 22, 676 So.2d at 630.
Unfortunately, the Yelverton case is inapplicable to the facts of the present case for it was decided prior to the amendment of La. Civ.Code art. 132 by Act No. 261 of 1993, which became effective on January 1, 1994. In a subsequent opinion in Harper v. Harper, 33,452, p. 5 (La.App. 2 Cir. 6/21/00), 764 So.2d 1186, 1189, the Second Circuit examined a 1994 Louisiana Law Review article that discussed the substantive change brought about by the 1993 amendments. The court in Harper quoted from the article and stated:
Under present Article 132, the focus of the inquiry is not on the joint custody arrangement; it is on sole custody in a particular parent. It must be shown, by clear and convincing evidence, that custody in that parent will serve the best interest of the child. The question changes from why joint custody is not in the best interest of the child to why sole custody in a particular parent is in the best interest of the child. Although these issues may overlap, the burden on the parent seeking sole custody is to demonstrate that the granting of custody to that parent alone will be in the best interest of the child.
Kenneth Rigby, 1993 Custody and Child Support Legislation, 55 La. L.Rev. 103, *623 105 (1994). The author further noted that the test shifted from "a negative to a positive one, from why joint custody to both parents is not in the child's best interest to why sole custody in a particular parent is in the child's best interest." Id. (Emphasis in original).
Harper, 33,452 at 5, 764 So.2d at 1189.
The Hawthorne case cited by the family court is inapposite as well. In Hawthorne, the Third Circuit affirmed a trial court judgment that awarded sole custody of the child to the father based upon evidence that the mother was afflicted with a personality disorder that manifested itself with screaming and prolonged fits of rage. In addition, the mother was found to have engaged in documented acts of fraud and plagiarism that brought into question her honesty and integrity. Finally, the trial court found that the mother had engaged in several seriously irrational acts to the point that her conduct had "many earmarks of insanity." Hawthorne, 96-89 at 21, 676 So.2d at 630.
The facts presented in Hawthorne are extreme, and no facts even remotely similar to the facts set forth therein are present in the instant case. Assuming, arguendo, that the family court applied the correct legal standard, it is clear that Ms. Walet failed to establish, through clear and convincing evidence, that sole custody was in the best interest of the minor child. It was therefore error for the family court to award sole custody of the child to Ms. Walet.
Having concluded that the family court erred, we are compelled to redetermine the facts de novo from the entire record and render a judgment on the merits. Rosell, 549 So.2d at 844 n. 2.
Facts Found on De Novo Review
Following an in-depth and comprehensive review of the record and transcript, we note that after Ms. Walet surreptitiously fled with the child from South Carolina in May 1997, Dr. Caulfield did not enjoy an extended period of visitation with his son until the following year in August 1998. On that occasion, Dr. Caulfield traveled from South Carolina and accompanied his parents to Gulf Shores, Alabama. Ms. Walet traveled with the child from New Orleans, and Dr. Caulfield paid for Ms. Walet to stay next door to him at the same resort. Dr. Caulfield testified that he would see the child during the day, and then Ms. Walet would take the child at night.
Apparently unbeknownst to Dr. Caulfield, Ms. Walet's stepmother, Mrs. Diane Walet ("Diane Walet"), accompanied her stepdaughter to Alabama in a separate car. Diane Walet testified that, for reasons that are not entirely clear, she and Ms. Walet followed Dr. Caulfield to a local restaurant/bar, the Flora-Bama, in separate cars. Diane Walet claimed that she and her stepdaughter sat across the road in their cars, and observed Dr. Caulfield leave the child alone in his car for a period she timed at thirty minutes. Diane Walet further claimed that she even took pictures of the incident, but testified that she did not bring the pictures with her to court, as they were not something she kept handy.
In his testimony, Dr. Caulfield admitted that he took the child with him to the Flora-Bama for lunch, but repeatedly denied that he ever left the child alone in his car. More importantly, Dr. Caulfield stated that he did not believe that Ms. Walet would have allowed the child to remain unattended in a car.
Dr. Caulfield testified that he agreed to submit to voluntary, random drug testing in November 1998, despite the fact that he was never required to undergo drug testing or substance abuse treatment in connection with the investigation of his medical *624 practice in South Carolina, in order to protect himself from unfounded allegations put forth by Ms. Walet and others.
Following her return to Louisiana and return to work, Ms. Walet and the child lived during the week in New Orleans with her father and stepmother.[11] Ms. Walet also enrolled the child in daycare at the Kidopelous Child Care Center. Dr. Caulfield testified when he later moved from South Carolina and took a job at Tulane, he had an office in New Orleans by the Kidopelous Child Care Center that his son attended, which is also the Tulane Medical Center daycare. The consent decree that the parties entered into on June 18, 1999, ordered that the child continue to attend the Kidopelous Child Care Center for the next twelve months,[12] and further permitted Dr. Caulfield to visit the child at the child care center provided said visits were not disruptive. Said judgment further provided Dr. Caulfield with his first periods of overnight visitation.
Both parties testified that the initial visitations between the child and Dr. Caulfield went fine; however, Ms. Walet later testified that following an overnight visitation in July, the child returned "inconsolable" and told her that he did not want to visit his father again. However, when his father came to pick him up at Kidopelous, the child smiled and ran to his father. After that visitation, according to Ms. Walet, the child would not go to the bathroom, placed his mother's hand over his genitals several times, experienced nightmares, and started swaying back and forth. Ms. Walet stated that although she did not see any physical signs of abuse, she contacted programs for battered women and child abuse agencies, and admitted, "until I got it sorted out, I was not sending my kid again." Ms. Walet took the child to see Dr. Kelly, a child psychologist, who found no evidence of sexual abuse. Ultimately, the family court stated that it "didn't pay ... any mind" to the allegations of sexual abuse, which Ms. Walet did not pursue any further.
Dr. Caulfield testified that in August 1999, Ms. Walet kept the child away from him without any explanation or telephone calls, and when Dr. Caulfield appeared at Kidopelous, he was not permitted to see the child. Thereafter, on or about October 22, 1999, Ms. Walet suddenly and unilaterally removed the child from Kidopelous, and relocated to Baton Rouge. Ms. Walet testified that due to her earlier suspicions of child abuse, she was not "on open communication" with Dr. Caulfield and failed to personally inform him of her decision to relocate.
During Thanksgiving 1999, Dr. Caulfield testified that he was supposed to have the child from Wednesday through Sunday. Dr. Caulfield conceded that he was supposed to return the child to Ms. Walet in Baton Rouge, but nevertheless made Ms. Walet travel to Covington to pick up the child.
The existing June 18, 1999 consent decree provided the child was to be returned to Ms. Walet's residence in New Orleans. Ms. Walet's attorney later asked Dr. Caulfield why, after Ms. Walet moved to Baton Rouge, he refused to take the child to Ms. Walet's father's home in New Orleans as Dr. Caulfield's former attorney had *625 agreed. Dr. Caulfield testified that his attorney at the time made this agreement without consulting him. He stated he would have complied had it been courtordered, but Dr. Caulfield believed it was unfair to make the child ride from his home in Mandeville to Ms. Walet's father's home in New Orleans, and then another hour to Ms. Walet's home in Baton Rouge. In Dr. Caulfield's opinion, picking the child up in Mandeville and then taking him home to Baton Rouge made more sense, so he refused to transport the child to New Orleans.
In December 1999, Dr. Caulfield was to have visitation for the weekend. He waited at the agreed upon place, McDonald's on Essen Lane, but Ms. Walet never appeared with the child. Ms. Walet admitted later that she took the child with her to New Orleans instead because she claimed she did not have Dr. Caulfield's current address or telephone number.
Since Ms. Walet's relocation to Baton Rouge, Dr. Caulfield had been picking the child up at the Montessori School in Baton Rouge for weekend visitation; however, in May 2000, when the school closed for the summer, Dr. Caulfield inquired as to where he should pick up the child. Ms. Walet purportedly responded that the visitation schedule imposed pursuant to the June 18, 1999 consent decree had expired. Dr. Caulfield was between attorneys at that point, thus, he went the entire summer, until mid-August 2000, without seeing his child.
During Christmas 2000, Dr. Caulfield took the child to see his parents in Birmingham, Alabama. The arrangement was that Dr. Caulfield was to pick up and return the child to Baton Rouge; however, Dr. Caulfield's sister called Ms. Walet to inform her that the train would be delayed. Ms. Walet drove to the train station in Slidell to pick up the child. Dr.
Caulfield testified that the nebulizer the child was using for a respiratory infection accompanied them to Birmingham and that the child was given all the necessary treatments. This testimony was contradicted by Ms. Walet who claimed that she accompanied the child and Dr. Caulfield to get the nebulizer out of the trunk of the car. Ms. Walet testified that Dr. Caulfield refused to use the nebulizer regularly, although she conceded Dr. Caulfield was more amenable to its use when Ms. Walet later explained to him that she had been asthmatic as a child.
By January 2001, and despite the fact that the specific periods of visitation set forth in the June 18, 1999 consent decree had long expired, the parties were nevertheless exchanging the child every other weekend. On one weekend in January when he was due to exercise visitation, Dr. Caulfield was advised that the child was sick. When Dr. Caulfield sought to make up his missed visitation, Ms. Walet purportedly refused. Dr. Caulfield admitted that the next time he received the child for weekend visitation, he decided unilaterally to keep the child for an additional two days to make up for the weekend of visitation he had missed. Ms. Walet testified that when she sought to reclaim her son, she was hindered in her attempt because she did not have a correct address for Dr. Caulfield, and the police would not assist her without a valid custody agreement.
When Dr. Caulfield failed to appear and return the child on Sunday, Ms. Walet contacted her attorney. An emergency telephone status conference between counsel and the judge was held on Tuesday, January 30, 2001, whereupon Ms. Walet obtained an order directing that the child be returned by 6:30 p.m. that evening. Dr. Caulfield admits that he was late in returning the child that evening due to roadwork on Interstate 12, but asserts that *626 he called Ms. Walet and apprised her of this fact.
As previously mentioned, Ms. Walet, during the summer of 2001, purportedly deprived Dr. Caulfield of the two weeks of visitation previously agreed upon. In response, Dr. Caulfield unilaterally elected to make up the missed time by keeping the child. Ms. Walet called upon the family court and local law enforcement to retrieve the child.
At trial, Dr. Caulfield testified that he made a "big mistake" in not communicating better, and admitted that while he may have given a partially incorrect address, Ms. Walet nevertheless knew the physical location of his apartment. In Dr. Caulfield's opinion, there were other ways to handle this matter without summoning the police. In connection with her testimony, Ms. Walet stated that the child had to be told that the reason he was picked up by the police was because "his daddy wasn't following the rules."
Despite the fact that the family court thereafter awarded temporary custody jointly to the parties, Ms. Walet nevertheless withheld visitation during Thanksgiving 2001, refused to communicate with Dr. Caulfield, and withheld visitation during December 2001 and most of January 2002. Ms. Walet contended initially she withheld visitation because she did not have an address for Dr. Caulfield, but later contended that while she had an address, the address could not be verified.
Dr. Caulfield also admitted candidly that he has not always paid his child support on time. Although he was current on his child support payments at the time of trial, Dr. Caulfield admitted that he had been behind in his payments on three occasions, and was accordingly in contempt of the court's orders regarding child support. While Dr. Caulfield testified that he did not think that he should be the sole custodial parent, he opined that Ms. Walet had abused her role as domiciliary parent and accordingly thought the parties should share domiciliary status. Dr. Caulfield stated that he wanted as much time as possible with his son, with both parents having equal access.
Following our review of the record in this matter, it is obvious that both Ms. Walet and Dr. Caulfield have been guilty of failures to communicate and cooperate with the other parent. In the opinion of this court, many, if not all, of the miscommunications and misunderstandings that occurred have resulted from the fact that too often, there was no valid custody decree or interim order that clearly and explicitly set forth each party's rights with respect to physical access to the child. While this court does not condone Dr. Caulfield's penchant for personally redressing perceived infractions of the custody plan by Ms. Walet, we note that such acts are insufficient to warrant an award of sole custody to Ms. Walet. On the other hand, we are disturbed by the fact that Ms. Walet has chosen to engage in a pattern of unilateral conduct whereby she grants and withholds visitation as she sees fit in direct defiance of the existing temporary custody decree. Unfortunately, such conduct on the part of Ms. Walet has become increasingly more commonplace despite the fact that the family court awarded temporary custody of the child jointly to the parties in September 2001. Despite her self-serving statements to the contrary, it is obvious Ms. Walet truly relishes her role as the final arbiter of what is best for the child, and would love to relegate Dr. Caulfield to the role of absentee parent.
Upon application of a clear and convincing evidence standard, we find no facts in the record sufficient to justify the family court's award of sole custody to Ms. Walet.
*627 It is therefore the opinion of this court that the best interests of the child mandate that the parties share joint custody of the child, with both parties having equal access to all medical and educational records, and all major medical and educational decisions affecting the minor child shall be mutually agreed upon. Additionally, it shall be a continuous and affirmative duty of both parties to provide the other party with an affidavit attesting to said party's current residential address, together with residential, office, and cellular telephone numbers. Subject to the foregoing, Ms. Walet shall be designated as the primary domiciliary parent of the child.
Accordingly, we hereby remand this matter to the family court for further proceedings and rendition of a joint custody implementation order consistent with this opinion and in accordance with the provisions of La. R.S. 9:335.
More Frequent Visitation During the School Year
The second issue raised by Dr. Caulfield is whether it is in the best interest of minor child to have more frequent contact with his father aside from every other weekend during the school year.
Louisiana Revised Statute 9:335 A(2)(b) provides that "[t]o the extent it is feasible and in the best interest of the child, physical custody ... should be shared equally." This was amended in 1995, and rather than a mandate requiring the equal sharing of physical custody in a joint custody situation, the law now provides that the equal sharing of physical custody of a child is recommended where such an arrangement is both "feasible," and "in the best interest of the child." Stephens v. Stephens, XXXX-XXXX, p. 7 (La. App. 1 Cir. 6/21/02), 822 So.2d 770, 776.
The record reflects that at the time the family court rendered its judgment, the child of the parties was five years old.
The child is now six years old and apparently now enrolled in elementary school. Although both parents reside in the same city, it is difficult for an appellate court, in de novo review, to fully formulate a feasible plan for implementation of joint custody. For this reason, and in light of our previous decision to remand this matter to the family court, we deem it advisable to entrust resolution of Dr. Caulfield's request for more frequent visitation with his son during the school year to the discretion of the family court.
Admissibility of Evidence Regarding DHEC Investigation
The third issue raised by Dr. Caulfield concerns the family court's admission of certain documents pertaining to a 1996 investigation by the State of South Carolina of his private medical practice. Through the filing of a Motion in Limine and vehement objections at the trial of this matter, Dr. Caulfield sought to exclude any reference to the South Carolina investigation that was resolved several months prior to his son's birth in Louisiana in 1996. Although the family court ordered an in camera inspection of the documents in question to determine their probative value, there is no record that such an inspection was ever conducted, and a final written order regarding the admissibility of this evidence was never rendered.
In her brief, Ms. Walet argues that C.E. art. 1101(B)(2) provides for a relaxed evidentiary standard to be applied in child custody proceedings where the central focus is the best interests of the child. Ms. Walet further asserts that such evidence is indicative of Dr. Caulfield's "base and immoral traits."
While we would agree that Dr. Caulfield's fitness as a parent is certainly relevant to a determination of child custody, we would have hoped that the family court *628 would have seen fit to balance the interests of the child against the danger of unfair prejudice to Dr. Caulfield. The family court clearly erred in allowing Ms. Walet to introduce at trial the deposition testimony of Robert Burgess, an investigator with the South Carolina DHEC, together with an uncertified copy of a consent agreement reached between Dr. Caulfield and DHEC, where said evidence established only that prior to his son's birth, Dr. Caulfield, or personnel in his office for whom he was answerable, failed to keep proper records of certain medications.
Nevertheless, we conclude that the introduction of evidence relating to the South Carolina DHEC investigation failed to indicate intentional wrongdoing on the part of Dr. Caulfield, and consequently, no penalties were imposed. While the admission of said evidence was improper, said admission was harmless error.
Imposition of $100,000.00 Bond Pursuant to La. R.S. 9:342
The final issue raised by Dr. Caulfield concerns the family court's requirement of a $100,000.00 bond pursuant to La. R.S. 9:342 to insure Dr. Caulfield's compliance with its child custody and visitation order.
Specifically, the judgment of the family court provides (in pertinent part):
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that pursuant to La. R.S. 9:342, John Justin Caulfield is to post a bond in the amount of $100,000.00 to secure compliance with the child custody and visitation order set forth herein.
Earlier, in its oral reasons for judgment, the family court opined (in pertinent part):
When you first testified as to your conflicting addresses, ... I thought to myself, yeah, yeah, okay, well, whatever.
And I was willing to believe you, once again, that you got confused, but, you know, really strange things started to happen to me during the hearing and it kind of didn't fall into place today. I started to see a bigger picture. When Jan Walet testified that she was worried that you were going to run off with the child, my first thoughts to myself oh, it's an overprotective mother because I hear that all the time.
Unfortunately, Dr. Caulfield, you began to fit the pattern, from your own testimony, of a parent who truly might run off with the child and that scared me. You have yet to give the court or Ms. Walet a correct address for either your home or your work. You, at this time, sir, are on, I don't know, your third residence, at a minimum; New Orleans, Covington, Mandeville to Baton Rouge and by your own testimony, it's not a permanent residence. You live with a student that you've known apparently since last fall. You're not sure what your caseload is as to your clientele. You're not sure what you make. You're living with your parents right now. I'm sorry. Strike that. You're not living with your parents. Your parents are helping to support you.
In short, I think the one thing Mr. Manseur said was, in fact, truthful, whether you want to believe it or not... is that you are playing games with everybody. You have played games with Jan Walet. I think you thought you were going to get away with playing games with the court. I don't know if you've gotten away with playing games with [your attorney], but I'm convinced, as [counsel for Ms. Walet] said, you are an extremely intelligent person. You can't get to where you are without being smart, sir. You have to have known that you were giving the wrong addresses. You have to have known that you *629 were being evasive, and I have to believe that the only reason you did that is to play games with Ms. Walet. It doesn't serve the child's best interest.
There is nothing under Article 134 that makes me believe it would be best for you to be a joint custodial parent. And I have to give sole custody to Ms. Walet. I've done it on so many limited occasions that it saddens me when I have to do that, sir. But you've done it to yourself; and I am convinced by the clear and convincing evidence burden not only that I have to give sole custody but that you are, in fact, a risk for fleeing with that child during visitation.
The visitation that I'm putting into place is Friday at 6:00 P.M. until Monday morning you bring the child back to school when school starts.... [A]lthough it's been requested by [counsel for Ms. Walet] on a number of occasions, I refused to believe I had to do this. At this point I believe I absolutely have to do thisputting into place a bond in accordance with 9:342, bond to secure child custody or visitation order in the amount of $100,000. Should you not bring that child back to school on one occasion, sir, you're forfeiting that bond. It's that stringent. Do you understand that, Dr. Caulfield? That bond also applies to all other aspects of the visitation order. If you do not comply in any manner, you will forfeit that bond.
In connection with our review of this matter, this court will take judicial notice of La. R.S. 9:342 that provides as follows:
§ 342. Bond to secure child custody or visitation order
For good cause shown, a court may, on its own motion or upon the motion of any party, require the posting of a bond or other security by a party to insure compliance with a child visitation order and to indemnify the other party for the payment of any costs incurred.
Despite the fact that the foregoing statute has been effective since January 1, 1994, this court could locate only one case applying said statute. In Hodges v. Hodges, 02-0489 (La.App. 3 Cir. 10/2/2002), 827 So.2d 1271, writ denied, 2002-2485 (La.11/8/2002), 828 So.2d 1122, a mother, with a history of having attempted suicide, was described by the trial court as "unraveling" after being diagnosed with three psychological disorders. After concluding that the mother was also willfully disrupting visitation and had attempted to have her ex-husband labeled a sociopath, the trial court directed that the mother post a bond to ensure her compliance with the court order. The court of appeal upheld the bond requirement finding that the mother had repeatedly refused to comply with the visitation schedule and orders of the court. Hodges, 02-0489 at 8, 827 So.2d at 1275-1276.
In the instant case, the family court, citing Dr. Caulfield's frequent relocations, and failure to comply with the court's visitation orders, imposed a similar bond requirement. In reviewing this matter, we find that while Dr. Caulfield has, between 1997 and 2002, moved three timesfirst to Mandeville, then Covington, and finally to Baton Rouge, we note that Ms. Walet has done the exact same thing. The record reflects that in early 1997 Ms. Walet moved to South Carolina, and back to New Orleans, to Baton Rouge and later to another location in Baton Rouge. Neither Ms. Walet nor Dr. Caulfield has a "permanent residence." However, while Dr. Caulfield has only moved closer to his son, it appears that Ms. Walet has only moved the child further away from his father.
As to the family court's finding that Dr. Caulfield presents "a risk for fleeing with that child during visitation," Ms. Walet *630 testified as to one incident that purportedly occurred after she surreptitiously left South Carolina with the child in May 1997. According to Ms. Walet, Dr. Caulfield was "irate," and threatened to take the child to South America where Ms. Walet would never find them. Ms. Walet further claimed that Dr. Caulfield "knows her fears," and plays games with her head by turning off his answering machine and failing to answer his phone. While Ms. Walet conveniently asserted that "[w]e shouldn't be having games," the record reflects that she is not above resorting to the same behavior. The record reflects that several times Ms. Walet acknowledged she purposely failed to answer Dr. Caulfield's calls. Additionally, we note that when Ms. Walet fled to Louisiana with the child and relocated in New Orleans, and later moved from New Orleans to Baton Rouge, she did so both times without advising Dr. Caulfield of her plans in advance.
While Dr. Caulfield freely admitted that he had a sister who lives in South America, he claimed that he would never take his child down there. Additionally, Dr. Caulfield stated that, "my sister wouldn't lie for me. If I showed up there with [my child] withoutif I wasn't supposed to, she would have turned me in." Dr. Caulfield further testified that he had never tried to pick up his child from daycare or school when he did not have visitation.
Based upon a review of the record and our findings, it is the opinion of this court that the family court was manifestly erroneous in its conclusion that Dr. Caulfield presented a risk for fleeing with the child during visitation. Furthermore, while this court certainly does not condone Dr. Caulfield's cavalier attitude with respect to visitation times and his penchant for personally redressing perceived infractions of the custody plan by the mother, we decline to say that such acts alone warrant the imposition of a $100,000.00 bond requirement by the family court. The family court's factual determination that Dr. Caulfield presents a flight risk warranting imposition of a bond is clearly wrong and must be reversed.
Having said that, we nevertheless recognize that pursuant to La. R.S. 9:342, a court "may, on its own motion or upon the motion of any party, require the posting of a bond or other security by a party to insure compliance with a child visitation order." Based upon our review of the record, we find that both parties were equally guilty of violating the family court's orders regarding custody.
Had this court been sitting as the trier of fact, we would have, in all likelihood, imposed a bond on both parties equally so as to insure their compliance with custody orders. Nevertheless, to the extent the family court believed that the evidence adduced at trial demonstrated that Dr. Caulfield alone presented a risk of failing to comply, we must, albeit reluctantly, concede that such a determination is within the much discretion afforded the family court. Accordingly, we will affirm the family court's imposition against Dr. Caulfield of a bond pursuant to La. R.S. 9:342 so as to insure his compliance with that court's child custody and visitation orders.
However, absent some evidence regarding Dr. Caulfield's assets, liabilities, his ability to secure a bond in such an extreme amount, and the very real possibility that even the most minor infraction would result in the bond's forfeiture, we find that the family court, in this instance, has effectively accomplished that which our law seeks to prohibitthe unwarranted denial of visitation between parent and child. Accordingly, we conclude that a bond in the amount of $100,000.00 is a clear abuse of discretion, and hereby reduce said bond to $7,500.00 with the understanding *631 that said bond shall be due only upon the showing of a willful violation by Dr. Caulfield of the family court's custody decree.
Interim Order
In the interim between the date of this judgment and the signing of a joint custody implementation order by the family court on remand, Dr. Caulfield shall post a bond in the amount of $7,500.00 to insure his compliance with the custody orders of the family court. Thereafter, and until the family court renders its own independent order implementing joint custody, the parties shall alternate custody every other weekend and on all major holidays. Weekend visitation shall commence at 6:00 P.M. on Friday and last until Monday morning at 8:00 A.M. when the party exercising visitation shall be responsible for delivering the child to his summer activity or school on that particular day. Further, it shall be a continuous and affirmative duty of both parties to provide the other party with an affidavit attesting to said party's current residential address, together with residential, office, and cellular telephone numbers.
Dr. Caulfield shall have visitation with the child from 8:00 A.M. on Thursday, July 3, 2003, until 8:00 A.M. on Monday, July 7, 2003. Additionally, Dr. Caulfield shall have a week of continuous visitation with the child between July 15, 2003 and July 31, 2003, and an additional week of continuous visitation with the child during the month of August 2003. Ms. Walet shall have visitation with the child from 8:00 A.M. on Friday, August 29, 2003, until 8:00 A.M. on Tuesday, September 2, 2003. To the extent possible, both parties should share visitation on October 11th, the child's birthday. This interim order of the First Circuit Court of Appeal shall expire upon the signing of a joint custody implementation order by the family court following remand.

CONCLUSION
For the above and foregoing reasons, the judgment of the family court is reversed in part, rendered, affirmed in part, and remanded to the family court with instructions. All costs associated with this appeal shall be assessed against appellee, Jan C. Walet.
REVERSED IN PART, RENDERED, AFFIRMED IN PART, AND REMANDED WITH INSTRUCTIONS.
CARTER, J., concurs in part and dissents in part for reasons assigned.
GUIDRY, J., concurs in the result.
McCLENDON, J., concurs in part and dissents in part.
CARTER, C.J., Dissenting in Part and Concurring in Part.
I respectfully dissent from the portions of the majority opinion that reverse the family court.
In my opinion, Ms. Walet proved by clear and convincing evidence that sole custody is in the best interest of the minor child, and I would affirm the trial court's award of sole custody to Ms. Walet.
I agree with the majority's finding that the family court was within its discretion in imposing the bond to ensure compliance with the visitation order. However, I disagree with the reduction of the bond to $7,500 because I believe the family court did not manifestly err in finding Dr. Caulfield presented a risk for fleeing with the child during visitation. This is a credibility issue, pure and simple, and credibility is almost exclusively within the province of the trial judge.
*632 Thus, I dissent from the award of joint custody and the reduction of the bond and concur in all other respects.
McCLENDON, J., Concurring in Part and Dissenting in Part.
I agree with the majority opinion, with the exception of the reduction of the bond issued pursuant to LSA-R.S. 9:342, from $100,000.00 to $7,500.00. In this regard, I respectfully dissent.
I do not believe that the trial court was manifestly erroneous in holding that Dr. Caulfield presented a risk for fleeing with the minor child during his visitation periods.
Accordingly, and given that the bond in question serves the dual purpose of insuring compliance with a child visitation order and indemnifying the other party for payment of any costs incurred, I would find that the lowest amount to which the bond should be reduced is $25,000.00.
NOTES
[1] The visitation that the family court awarded to Dr. Caulfield was not raised as an issue in this appeal.
[2] Ms. Walet stated that she moved to South Carolina in September 1995; however, Dr. Caulfield testified that Ms. Walet did not move to South Carolina until November 1995.
[3] Again, Ms. Walet stated that she left South Carolina in June 1996; however, Dr. Caulfield testified that Ms. Walet first moved in with his nurse, and later left South Carolina for Louisiana in July 1996.
[4] There is no evidence in the record to suggest that Dr. Caulfield had previously submitted to random drug testing in South Carolina. Dr. Caulfield later testified that he never underwent substance abuse treatment, but admitted that he submitted to voluntary, random drug testing in November 1998, to protect him from unfounded allegations by Ms. Walet. Several months before the birth of his son, Dr. Caulfield was investigated by the South Carolina Department of Health and Environmental Control (DHEC) on August 7, 1996, for claims that he failed to keep proper records of controlled substances, issued a false prescription to replace a bottle of Valium tablets he had taken personally, and wrongfully issued two prescriptions to someone who was not a patient. Dr. Caulfield
[5] Under the provisions of the June 18, 1999 judgment, a status conference to determine future custody was to be held in September 1999. A trial on the custody issue was to be held in February 2000. Nevertheless, court minutes reflect that all future hearings were repeatedly continued without date.
[6] Walet v. Caulfield, XXXX-XXXX (La.App. 1 Cir. 3/20/01) (unpublished).
[7] A minute entry in the record states only that the hearing scheduled for April 17, 2001, was "[p]assed pursuant to a written stipulation being submitted at a later date." No such stipulation appears in the record.
[8] Earlier in his testimony, Dr. Caulfield contended that he thought six weeks visitation during the summer was standard in most cases.
[9] Walet v. Caulfield, XXXX-XXXX (La.App. 1 Cir. 6/11/02) (unpublished).
[10] Walet v. Caulfield, XXXX-XXXX (La.7/1/02), 819 So.2d 1026.
[11] On weekends, Ms. Walet and the child would travel to her mother and stepfather's home in Baton Rouge.
[12] The agreement further ordered that any relocation of the child "shall be governed by and shall be in accordance with La. R.S. 9:355 et seq. In addition, said rules shall apply in the event that either party moves from their current residence to a distance of more than fifty (50) miles from said residence."